NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11761

COMMONWEALTH  vs.  ERICK COTTO, JR.


Hampden.     December 4, 2014. - April  , 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk,
& Hines, JJ.


Controlled Substances.  Constitutional Law, Plea, Conduct of
     government agents, Subpoena, Self-incrimination.  Due
     Process of Law, Plea, Disclosure of evidence, Presumption.
     Practice, Criminal, Plea, Conduct of government agents,
     Disclosure of evidence, Presumptions and burden of proof,
     Subpoena.  Evidence, Guilty plea, Certificate of drug
     analysis, Exculpatory, Disclosure of evidence, Presumptions
     and burden of proof, Testimonial privilege.  Witness,
     Subpoena, Self-incrimination, Privilege.  Privileged
     Communication.



     Indictments found and returned in the Superior Court
Department on June 14, 2007.

     A motion to withdraw guilty pleas, filed on April 25, 2013,
was heard by C. Jeffrey Kinder, J.

     The Supreme Judicial Court granted an application for
direct appellate review.


     Rebecca A. Jacobstein, Committee for Public Counsel
Services, for the defendant.
     Katherine A. Robertson, Assistant District Attorney, for
the Commonwealth.

Luke Ryan, for Rafael Rodriguez, amicus curiae, submitted a brief.

Glynis MacVeety, for Deon Charles, amicus curiae, submitted a brief.

SPINA, J.  On June 14, 2007, a Hampden County grand jury indicted the defendant, Erick Cotto, Jr., on charges of trafficking in cocaine (twenty-eight to one hundred grams), G. L. c. 94C, § 32E (b) (2); unlawful possession of ammunition without a firearm identification card, G. L. c. 269, § 10 (h); and being an armed career criminal, G. L. c. 269, § 10G (b). Sonja Farak, then a chemist at the Department of Public Health's State Laboratory Institute in Amherst (Amherst drug lab), tested the substances in the defendant's case on June 8, 2007, and signed the certificates of drug analysis (drug certificates).[1] Pursuant to a plea agreement, the defendant pleaded guilty on April 13, 2009, to trafficking in cocaine (fourteen to twenty-eight grams), and unlawful possession of ammunition.[2]

---

[1] Sonja Farak was a chemist for the Department of Public Health from July, 2003, until January 19, 2013.  During the first year of her employment, she worked at the William A. Hinton State Laboratory Institute in the Jamaica Plain section of Boston.  After that, Farak worked at the Department of Public Health's State Laboratory Institute in Amherst (Amherst drug lab).

[2] With respect to the trafficking charge, the defendant was sentenced to from five years to five years and one day in State prison.  With respect to the ammunition charge, he was sentenced to one year in a house of correction, to be served concurrently with the sentence on the trafficking charge.

On April 1, 2013, a State grand jury indicted Farak on four counts of tampering with evidence, G. L. c. 268, § 13E; four counts of theft of a controlled substance (cocaine) from a dispensary, G. L. c. 94C, § 37; and two counts of unlawful possession of a class B substance (cocaine), G. L. c. 94C, § 34. Approximately three weeks later, the defendant filed a motion to withdraw his guilty pleas pursuant to Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001). He claimed that Farak was a government agent by virtue of her role at the Amherst drug lab, that her misconduct was widespread and egregious, and that such misconduct antedated his guilty pleas. As a consequence, the defendant asserted that because his guilty pleas were based, in part, on an assumption that the drug certificates were truthful and accurate, his decision to plead guilty was not knowing, voluntary, and intelligent. The defendant further claimed that Farak's misconduct constituted newly discovered evidence that would have had a significant impact on his decision to plead guilty and cast serious doubt on the justice of his convictions.[3] On October 30, 2013, a Superior Court judge

---

[3] In an affidavit dated April 19, 2013, the defendant's trial counsel stated that, at the time she advised her client to plead guilty, she was not aware of Farak's misconduct. If she had been aware of such misconduct prior to the defendant's pleas, she would not have advised him to plead guilty. Instead, she would have advised the defendant to either negotiate for a better plea offer or go to trial.

denied the defendant's motion.  Farak pleaded guilty to all ten charges on January 6, 2014.

The defendant appealed, and we granted his application for direct appellate review.  The defendant now contends that the judge abused his discretion by (1) failing to afford the defendant the benefit of the conclusive presumption articulated in Commonwealth v. Scott, 467 Mass. 336, 352-353 (2014), that egregious misconduct by Farak occurred in the defendant's case; (2) ignoring direct and circumstantial evidence of misconduct by Farak that antedated the entry of the defendant's guilty pleas; and (3) finding that the defendant would have pleaded guilty notwithstanding Farak's misconduct.  The defendant also claims that the judge erred by quashing a subpoena that had been issued to Farak's spouse, Nikki Lee, where she was a necessary witness for the defense.  For the reasons set forth below, we vacate the order denying the defendant's motion to withdraw his guilty pleas, and we conclude that, given the Commonwealth's failure to thoroughly investigate the matter of Farak's misconduct at the Amherst drug lab, the defendant is entitled to a measure of relief, as will be described in detail.[4]  We remand the case for further proceedings in accordance with this opinion.

---

[4] We acknowledge the amicus briefs submitted by Rafael Rodriguez and Deon Charles, defendants in two other Amherst drug lab cases whose motions to withdraw their respective guilty pleas were denied.  See note 5, infra.  Their appeals have been

1.  Background on the Amherst drug lab.[5]  The Amherst drug lab began operation in 1987 with the primary function of analyzing suspected controlled substances for law enforcement agencies involved in the prosecution of criminal cases in western Massachusetts.[6]  As of January, 2013, there were four employees at the facility, and each one could access the evidence safe by means of an electronic card or a key.  On January 17, 2013, the evidence officer at the Amherst drug lab, Sharon Salem, was attempting to match drug certificates with the corresponding samples when she realized that she was missing the samples in two cases.  Records reflected that Farak had completed testing on those samples earlier in the month and had confirmed that the substances were cocaine.  On January 18,

---

stayed by the Appeals Court pending our decision in the present case.

    [5] In the fall of 2013, the judge in the present case conducted an evidentiary hearing on postconviction motions filed by fifteen defendants who claimed that alleged criminal conduct by Farak rendered their guilty pleas to various drug charges unknowing, unintelligent, and involuntary, and that this newly discovered evidence cast doubt on the justice of their convictions.  The evidence presented at the hearing was limited to (1) the timing and scope of Farak's alleged criminal conduct; (2) the timing and scope of conduct underlying negative findings in an October 10, 2012, quality assurance audit of the Amherst drug lab by the State police (see note 11, infra); and (3) the extent to which Farak's alleged criminal conduct and the audit findings might relate to the testing of drug evidence in the fifteen defendants' cases.

    [6] On July 1, 2012, the responsibility for oversight of the Amherst drug lab was transferred from the Department of Public Health to the State police.

Salem reported the missing evidence to her supervisor, James Hanchett, who searched Farak's work station and discovered, among other items, a manila envelope containing the packaging for the two missing samples, which had been cut open. Testing of the substances in the packaging was negative for cocaine, contrary to Farak's earlier analysis.

Hanchett immediately contacted the State police, who shut down the Amherst drug lab and began an investigation. They discovered two additional case envelopes in a temporary storage locker used by Farak, a location where evidence was not allowed to be stored overnight. Although each envelope was supposed to contain suspected cocaine, neither did, and a search for those substances was unsuccessful. Investigators also interviewed Farak's colleagues who said that, beginning in September, 2012, they observed a change in Farak's behavior, including frequent unexplained absences from her work station and a decrease in productivity.

On January 19, 2013, the State police forensic services conducted an inventory of all drug evidence at the Amherst drug lab. Only the four above-described samples were missing. A similar inventory conducted approximately four months earlier had not uncovered any missing samples. Also on January 19, the State police searched Farak's vehicle pursuant to a warrant and seized, among other items, manila envelopes bearing case

numbers, paperwork relating to the Amherst drug lab, a plastic bag containing a white powdery substance and a brown tar-like substance, a plastic bag containing assorted pills, and photocopies of three newspaper articles about individuals who had been investigated, charged, or sentenced for the illegal possession or theft of controlled substances.[7]  Attached to one of the articles was a handwritten note stating, "Thank [G]od I'm not a law enforcement <u>officer</u>" (emphasis in original).

Farak was arrested at her home that same day.  She was charged by criminal complaint in the District Court with unlawful possession of a class A substance (heroin), unlawful possession of a class B substance (cocaine), and two counts of tampering with evidence.  On January 25, 2013, the State police searched a tote bag that had been seized from Farak's work station pursuant to a warrant.  The bag contained a variety of substances that could be used to dilute or replace cocaine (soap, baking soda, soy candle flakes, and oven-baked clay),

---

[7] One of the newspaper articles, dated March 29, 2011, had been printed from a computer on September 20, 2011, and was a story about the illegal possession of steroids by law enforcement officers.  A second newspaper article, dated October 25, 2011, had been printed from a computer on October 28, 2011, and was a story about a Pittsfield pharmacist being sentenced to three years in prison for stealing OxyContin from her workplace.  The article mentioned that the pharmacist had replaced the OxyContin with other medications.  A third newspaper article, dated December 2, 2011, had been printed from a computer on December 6, 2011, and was a story about a former San Francisco police department drug laboratory technician who stole cocaine from her workplace.

other items commonly used in the drug trade (plastic laboratory dishes, waxed paper, and fragments of copper wire), and several evidence bags that had been cut open. The evidence bags bore diverse dates from December 16, 2012, to January 6, 2013.

On April 1, 2013, a State grand jury indicted Farak on four counts of tampering with evidence at the Amherst drug lab, four counts of stealing cocaine from that facility, and two counts of unlawful possession of cocaine. While proceedings were ongoing in the Superior Court with respect to these charges, four additional cases surfaced in which it seemed, based on retesting, that Farak may have removed cocaine from samples that were submitted to the Amherst drug lab for analysis between June 15 and October 10, 2012, and replaced at least some of the cocaine with a counterfeit substance. It is not clear from the record why this particular evidence was selected for retesting. Nonetheless, it does appear that no charges were brought against Farak with respect to these four additional cases. On January 6, 2014, Farak pleaded guilty to all ten charges.[8]

_____

[8] With respect to the first count of tampering with evidence (Count I), Farak was sentenced to two and one-half years in a house of correction, with eighteen months to serve, and the balance suspended with probation for five years, with special conditions. Farak was given the same sentence on the second and third counts of tampering with evidence, as well as on three counts of theft of a controlled substance, each sentence to run concurrently with the sentence on Count I. With respect to each of the two counts of unlawful possession of a class B substance, Farak was sentenced to serve one year in a house of correction, each sentence to run concurrently with the sentence on Count I.

2. <u>Factual and procedural history</u>. In the spring of 2007, Springfield police Officer Thomas Nehmer discovered, through the use of a confidential informant, that the defendant was selling cocaine. On May 4, 2007, based on information received from the informant regarding the defendant's involvement in an upcoming drug deal, the police established surveillance at the time and place of the transaction. When the defendant arrived as predicted, he was secured by police and found to be in possession of two cellular telephones, ninety-one dollars, and what appeared to be approximately eight grams of cocaine. He was placed under arrest and transported to the police station. Following a waiver of his Miranda rights, the defendant told officers that in his bedroom at his residence were packaging materials, scales, and approximately thirty grams of cocaine. Officer Nehmer applied for and was granted a search warrant. When officers searched the defendant's residence, they discovered fifty-eight rounds of .22 caliber ammunition, scales, cutting agents, and two bags containing substances that appeared to be cocaine and weighed approximately forty-four grams. The substances were tested by Farak at the Amherst drug lab on

---

With respect to the fourth count of tampering with evidence and the fourth count of theft of a controlled substance, Farak was sentenced to five years' probation, to run concurrently with her probation on the other charges.

June 8, 2007.  According to the drug certificates that she signed, each substance tested positive for cocaine.[9]

On April 13, 2009, after engaging in a thorough colloquy with the judge and before Farak's misconduct had become known, the defendant pleaded guilty to trafficking in cocaine (fourteen to twenty-eight grams), and unlawful possession of ammunition. The bases for his subsequent motion to withdraw his guilty pleas were twofold.  First, the alleged criminal conduct by Farak at the Amherst drug lab rendered his guilty pleas unknowing, unintelligent, and involuntary.  Second, such misconduct constituted newly discovered evidence that cast real doubt on the justice of his convictions.  The judge considered each contention in turn.

In deciding whether the defendant's pleas were knowing, voluntary, and intelligent, the judge relied on the analysis articulated in Ferrara v. United States, 456 F.3d 278, 290 (1st Cir. 2006).[10]  He stated that a defendant seeking to set aside a guilty plea as involuntary must show that (1) the government or its agents committed some egregiously impermissible conduct that

_____

[9] According to the Commonwealth, the drugs seized from the defendant have been destroyed.

[10] At the time the judge ruled on the defendant's motion to withdraw his guilty pleas, he did not have the benefit of our decision in Commonwealth v. Scott, 467 Mass. 336 (2014), which also relied on the analysis set forth in Ferrara v. United States, 456 F.3d 278, 290 (1st Cir. 2006).

antedated the entry of the plea, and (2) the misconduct was material to the defendant's choice to plead guilty. See id. With regard to the first part of the inquiry, the judge concluded that, given Farak's role at the Amherst drug lab, she must be deemed to be an agent of the Commonwealth. Next, the judge considered whether Farak's alleged misconduct antedated the defendant's guilty pleas on April 13, 2009. The judge said that, although there was "powerful evidence" that Farak had engaged in egregiously impermissible conduct by stealing cocaine and replacing it with other substances, he was not persuaded that she was doing so at the time of the defendant's guilty pleas. Therefore, the defendant failed to establish that Farak's misconduct antedated his guilty pleas. Further, in the judge's view, the negative findings made during an October, 2012, quality assurance audit of the Amherst drug lab were disconcerting, but there was no evidence that these general deficiencies had any bearing on the testing performed in the defendant's case.[11] As such, the findings of the audit did not

---

[11] On October 10, 2012, the State police conducted a quality assurance audit of the Amherst drug lab. It was a routine matter in the sense that quality assurance audits are conducted at all State police laboratories every year, but this facility never had been audited. See note 6, supra. Among other purposes, the audit was designed to determine what steps the Amherst drug lab would have to take in order to meet accreditation standards required by the American Society of Crime Lab Directors/Laboratory Accreditation Board. The Amherst drug lab had not been accredited since it began operation in 1987 and, in fact, all State police laboratories operated

amount to the kind of egregiously impermissible government conduct contemplated by the Ferrara case.

The judge then considered the second part of the Ferrara inquiry, namely whether Farak's misconduct would have been material to the defendant's decision to plead guilty.  The judge stated that there was no evidence that the test results in this case were inaccurate, or that Farak was involved in any misconduct at the time of the defendant's guilty pleas.  Moreover, he continued, there were good reasons for the defendant to accept the plea agreement.  Given the strength of the Commonwealth's case (including the defendant's own incriminating statements), the significant benefit the defendant received from the plea agreement, and the absence of any

without accreditation prior to 2002.  The negative findings in the October, 2012, audit of the Amherst drug lab included the following:  chain of custody with respect to evidence kept in short-term overnight storage was not documented appropriately, and evidence retained in such storage was not sealed properly; evidence seals were initialed, but not dated, by the chemists; variances between weights of substances on arrival and weights at testing were not documented; and inventory discrepancies were not verified.  In addition, so-called "reagents" were not regularly tested, and known drug standards were not verified on a daily basis.  The audit team recommended steps to remediate each of these problems, and personnel at the Amherst drug lab took measures to address the negative findings.  Cathleen Morrison, a member of the audit team and an author of the audit report, testified at the evidentiary hearing, see note 5, supra, that the audit did not raise any questions regarding the reliability of the testing performed at the Amherst drug lab. The judge concluded that, although the negative findings in the audit "reflect[ed] a lax atmosphere in which theft of controlled substances could go undetected for a period of time, the audit did not reveal any unreliable testing."

evidence that Farak's misconduct affected the drug testing in the defendant's case, the judge concluded that Farak's misconduct would not have been material to the defendant's decision to plead guilty, even if such misconduct had antedated the defendant's pleas. The judge also found that the negative audit of the Amherst drug lab failed to satisfy the threshold of materiality required to invalidate the defendant's guilty pleas. Accordingly, based on the totality of the circumstances, the judge concluded that the defendant had failed to establish that his guilty pleas were not knowingly, intelligently, and voluntarily made.

Finally, the judge considered whether Farak's misconduct at the Amherst drug lab constituted newly discovered exculpatory evidence that cast real doubt on the justice of the defendant's convictions. The judge first determined that there was no evidence that the defendant or his attorney was aware of Farak's misconduct or the negative audit, or that either reasonably could have been discovered at the time of the defendant's pleas. Therefore, the judge continued, the evidence of Farak's misconduct, in particular, and the administrative problems at the Amherst drug lab, in general, qualified as "newly discovered." However, for all of the reasons he already had articulated, the judge stated that this newly discovered evidence was "not sufficiently weighty, potent, or pertinent to

the fundamental issues of this case to be worthy of consideration at a new trial."

3.   Standard of review.   A motion to withdraw a guilty plea is treated as a motion for a new trial pursuant to Mass. R. Crim. P. 30 (b).   Commonwealth v. Furr, 454 Mass. 101, 106 (2009).   "Under Mass. R. Crim. P. 30 (b), a judge may grant a motion for a new trial any time it appears that justice may not have been done.   A motion for a new trial is thus committed to the sound discretion of the judge."   Scott, 467 Mass. at 344. We review the allowance or denial of a motion to withdraw a guilty plea to determine whether the judge abused that discretion or committed a significant error of law.   Id.   We accept the judge's findings of fact if they are supported by the evidence, because the judge who heard the witnesses testify is the "final arbiter [on] matters of credibility."   Id., quoting Commonwealth v. Schand, 420 Mass. 783, 787 (1995).

4.   Discussion.   Due process requires that a plea of guilty be accepted only where "the contemporaneous record contains an affirmative showing that the defendant's plea was intelligently and voluntarily made."   Furr, 454 Mass. at 106, citing Boykin v. Alabama, 395 U.S. 238 (1969), and Commonwealth v. Foster, 368 Mass. 100, 102 (1975).   "A guilty plea is intelligent if it is tendered with knowledge of the elements of the charges against the defendant and the procedural protections waived by entry of

a guilty plea." Scott, 467 Mass. at 345. See Commonwealth v. Duest, 30 Mass. App. Ct. 623, 630-631 (1991). "A guilty plea is voluntary so long as it is tendered free from coercion, duress, or improper inducements." Scott, supra. Typically, a motion to withdraw a guilty plea will allege a facial defect in the plea procedures, but a guilty plea "also may be vacated as involuntary because of external circumstances or information that later comes to light." Id., and cases cited.

We begin by reviewing the framework for analyzing the defendant's motion to withdraw his guilty pleas. In Ferrara, 456 F.3d at 280, 284, 290-293, the United States Court of Appeals for the First Circuit analyzed whether blatant misconduct by the government, discovered more than ten years after entry of the defendant's guilty plea, could render such plea involuntary. The prosecutor in Ferrara deliberately manipulated a key witness, failed to disclose exculpatory evidence, and affirmatively misrepresented the nature of the witness's planned testimony. Id. at 291-293. The court concluded that when a defendant seeks to vacate a guilty plea as a result of underlying government misconduct, rather than a defect in the plea procedures, the defendant must show both that "egregiously impermissible conduct . . . by government agents . . . antedated the entry of his plea," and that "the misconduct influenced his decision to plead guilty or, put another way,

that it was material to that choice."  Id. at 290.  Relying on Ferrara, this court articulated in Scott, 467 Mass. at 346-358, a two-prong framework for analyzing a defendant's motion to withdraw his guilty plea under Mass. R. Crim. P. 30 (b) in a case involving the misconduct of Annie Dookhan, a chemist at the William A. Hinton State Laboratory Institute's forensic drug laboratory (Hinton drug lab) from 2003 to 2012.  Under the first prong of the analysis, a defendant must show egregious misconduct by the government that preceded the entry of the defendant's guilty plea and that occurred in the defendant's case.  Id. at 347-354.  Under the second prong of the analysis, a defendant must demonstrate a reasonable probability that he or she would not have pleaded guilty had he or she known of the government misconduct.  Id. at 354-358.

We recognized in Scott that, given the breadth and duration of Dookhan's malfeasance, it might be impossible for a defendant to show the required nexus between the government misconduct and the defendant's own case.  Scott, 467 Mass. at 351-352. Dookhan's "insidious" misconduct, "which belie[d] reconstruction, [was] a lapse of systemic magnitude in the criminal justice system."  Id. at 352.  Consequently, we established a special evidentiary rule whereby a defendant seeking to vacate a guilty plea under rule 30 (b) as a result of the revelation of Dookhan's misconduct, and proffering a drug

certificate from the defendant's case signed by Dookhan on the line labeled "Assistant Analyst," would be entitled to "a conclusive presumption that egregious government misconduct occurred in the defendant's case." Id. Application of this conclusive presumption in a particular case meant that a defendant's evidentiary burden to establish each element of the first prong of the Ferrara-Scott framework was satisfied. Id. at 353-354. We emphasized in Scott that this special evidentiary rule is unique in that it is "a remedy dictated by the particular circumstances surrounding Dookhan's misconduct as a chemist at the Hinton drug lab and is intended to apply only to this narrow class of cases in which a defendant seeks to withdraw his or her guilty plea after having learned of Dookhan's misconduct." Id. Further, we stated that "[s]hould the Ferrara analysis be applied in the case of a motion for a new trial under Mass. R. Crim. P. 30 (b) that does not arise from the investigation of Dookhan, the defendant will have the burden to establish each element of the first prong of Ferrara, and the adequacy of the defendant's showing will be committed to the sound discretion of the motion judge" (emphasis added). Id. at 354.

a. Prong one of the Ferrara-Scott analysis: egregious misconduct by the government in the defendant's case. In the present appeal, the defendant contends that Farak's misconduct

at the Amherst drug lab was egregious, and that Farak was a government agent such that her misconduct is attributable to the Commonwealth. Moreover, in the defendant's view, Farak's misconduct was systemic in magnitude. As a consequence, the defendant argues, he was entitled to the conclusive presumption articulated in Scott, 467 Mass. at 352-353, and, therefore, he was not required to prove that such misconduct occurred in his own case. The defendant asserts that even if this court does not apply the conclusive presumption, it still should determine that, because there was direct and circumstantial evidence suggesting that Farak's misconduct antedated the entry of his guilty pleas, misconduct must have occurred in his case. Given all of these circumstances, the defendant contends that the discovery of Farak's egregious misconduct after he had tendered his guilty pleas rendered those pleas unknowing, unintelligent, and involuntary. As such, the defendant continues, the judge abused his discretion in denying the defendant's motion to withdraw his guilty pleas.[12] We agree with the defendant that

---

[12] In Scott, the defendant argued that "relief [might] be available to him under Brady v. Maryland, 373 U.S. 83, 87 (1963), as a result of the prosecution's failure to disclose the potentially exculpatory evidence of Dookhan's misconduct to the defendant prior to his guilty plea." Scott, 467 Mass. at 346 n.5. In the present case, the defendant has not raised such an argument, presumably because evidence of misconduct by Farak had not yet come to light at the time the defendant pleaded guilty on April 13, 2009. As such, there was nothing for the Commonwealth to disclose.

Farak's misconduct was egregious and that it is attributable to the Commonwealth. However, based on the evidence of her misconduct that has been uncovered thus far, we disagree with the defendant that he is entitled to the conclusive presumption articulated in Scott, or, alternatively, that he has shown that Farak's malfeasance antedated the entry of his guilty pleas. Nonetheless, given the absence of a thorough investigation into the matter by the Commonwealth, and the cloud that overshadows the integrity of drug analyses performed by Farak at the Amherst drug lab, we conclude that the defendant is entitled to a measure of relief, as will be described. We turn to the Ferrara-Scott framework.

i. Egregious misconduct. On January 6, 2014, Farak pleaded guilty to, among other offenses, four counts of tampering with evidence at the Amherst drug lab and four counts of stealing cocaine from that facility. There is no dispute between the parties that this constituted "egregious misconduct" by Farak. She was entrusted with analyzing purported drug samples, signing drug certificates that identified and set forth the precise weight of each sample, and testifying to the results of her analyses. By tampering with evidence, Farak cast serious doubt on the integrity of this entire process. Her misconduct could render a defendant's guilty plea involuntary by wholly undermining the evidentiary foundation of the Commonwealth's

case.  We conclude that Farak's misconduct constitutes the type of egregious misconduct that satisfies the first element of the first prong of the Ferrara-Scott analysis.  See Scott, 467 Mass. at 347-348.  See also Ferrara, 456 F.3d at 290-293.

ii.  By the government.  The defendant contends that because Farak was a government agent, her misconduct is attributable to the Commonwealth.  In contrast, the Commonwealth argues that Farak's misconduct, while egregious, was an individual unlawful scheme and, as such, should not be attributable to the Commonwealth.  We agree with the defendant's position.

In Scott, 467 Mass. at 348-350, we considered various circumstances where actions by a range of government agents might constitute misconduct "by the government" that could render a defendant's guilty plea involuntary.  See, e.g., United States v. Fisher, 711 F.3d 460, 467 (4th Cir. 2013) (law enforcement officer's conduct in lying in search warrant affidavit in defendant's case, regardless of prosecutor's lack of actual knowledge of officer's wrongdoing, constituted impermissible government conduct).  In the related context of a prosecutor's duty to disclose exculpatory evidence to the defense, we pointed out that, generally speaking, "the prosecutor's duty does not extend beyond information held by 'agents of the prosecution team,'" Scott, supra at 349, quoting

Commonwealth v. Thomas, 451 Mass. 451, 454 (2008), but that "individuals other than prosecutors and police may be considered agents of the prosecution team." Scott, supra. See Commonwealth v. Martin, 427 Mass. 816, 824 (1998) (prosecutor's duty to disclose exculpatory evidence extends to information in possession of chemist at State police crime laboratory who "has participated in the investigation or evaluation of the case and has reported to the prosecutor's office concerning the case"); Commonwealth v. Woodward, 427 Mass. 659, 679 (1998) (medical examiner considered to be agent of Commonwealth). We concluded in Scott that Dookhan, in her role as a chemist at the Hinton drug lab, was an agent of the Commonwealth whose misconduct was attributable to the government for the limited purposes of the Ferrara analysis. Scott, 467 Mass. at 349-350. Significantly, it appeared from the record that Dookhan had engaged in egregious misconduct "to further what she perceived to be the mission of the Commonwealth" -- getting criminals off the streets -- and not to further her own "individual unlawful scheme." Id. at 350, quoting Commonwealth v. Waters, 410 Mass. 224, 230 (1991). Contrast Commonwealth v. Campiti, 41 Mass. App. Ct. 43, 65-66 (1996) (defendant not entitled to new trial where State police officer involved in investigation of defendant embezzled money from district attorney's office to

support gambling habit, but where such activity did not taint voluminous evidence against defendant).

Farak, like Dookhan, was an agent of the prosecution team, given that, where she was the analyst for a purported drug sample recovered from a defendant, she "participated in the investigation or evaluation of the case" and "reported to the prosecutor's office concerning the case." Scott, supra at 349, quoting Martin, 427 Mass. at 824. In addition, Farak was "expected to testify as [an] expert witness[] regarding the testing of samples in various criminal prosecutions." Scott, supra at 350. Admittedly, it appears from the record that Farak was tampering with evidence at the Amherst drug lab in order to support her own cocaine habit. Nonetheless, the effect of her misconduct was to raise serious questions about the integrity of her work on behalf of the Commonwealth. With respect to at least eight known cases, it seems apparent that Farak's actions tainted the drug analysis process which, in turn, raises concerns about the reliability of her analyses in other cases where she was the assistant analyst. Such malfeasance goes right to the heart of the Commonwealth's ability to convict a defendant in a drug case and, therefore, is directly related to "the Commonwealth's interest in law enforcement." Waters, 410 Mass. at 230. Farak's misconduct was not merely an "individual unlawful scheme," id., and, as such, is attributable to the

Commonwealth. The defendant has satisfied the second element of the first prong of the Ferrara-Scott analysis. See Scott, 467 Mass. at 348-350. See also Ferrara, 456 F.3d at 290-293.

iii. In the defendant's case. Finally, the third element of the first prong of the Ferrara-Scott analysis requires the defendant to show that egregious misconduct by Farak antedated the entry of his guilty pleas and occurred in his own case. See Scott, supra at 350-354. See also Ferrara, supra at 290. The defendant asserts that he was entitled to the conclusive presumption articulated in Scott, supra at 352-353, and, therefore, he was not required to prove that Farak's misconduct occurred in his case. Further, the defendant continues, even if this court does not apply the conclusive presumption, it still should determine that, because there was both direct and circumstantial evidence suggesting that Farak's misconduct antedated the entry of his guilty pleas, misconduct must have occurred in his case. We conclude that the evidence on which the defendant relies is not sufficient, at this juncture, to establish either that Farak's misconduct constituted a systemic problem warranting application of the conclusive presumption, or that her misconduct antedated the entry of the defendant's guilty pleas.

In Scott, we determined that "furnishing a drug certificate signed by Dookhan as a primary or secondary chemist in the

defendant's case [was] sufficient to establish the requisite nexus between the defendant's case and Dookhan's misconduct." Scott, 467 Mass. at 354. Our bases for establishing a conclusive presumption that "egregious government misconduct occurred in the defendant's case" were our reasonable certainty that Dookhan's misconduct "touched a great number of cases," and that it was a "lapse of systemic magnitude in the criminal justice system" that "belie[d] reconstruction." Id. at 352. In the present case, no such reasonable certainty exists.

Unlike the circumstances in Scott where the State police detective unit of the Attorney General's office conducted a broad formal investigation into Dookhan and her practices at the Hinton drug lab, see Scott, 467 Mass. at 339, the Commonwealth's investigation into the timing and scope of Farak's misconduct has been cursory at best. Nonetheless, based on the record before us, only eight cases thus far have surfaced in which it appears that Farak tampered with evidence at the Amherst drug lab, beginning perhaps in the summer of 2012[13] and continuing

---

[13] The motion judge was not persuaded that it was reasonable to infer from Farak's possession of the newspaper articles that were printed in the fall of 2011, see note 7, supra, that she was stealing controlled substances at that time. We conclude that the judge did not abuse his discretion in making this determination.

until January, 2013.[14]  It goes without saying that eight cases are eight cases too many.  However, the scope of Farak's misconduct does not appear to be, at this point in time, comparable to the enormity of Dookhan's misconduct at the Hinton drug lab.  Among other wrongdoing, Dookhan admitted to "dry labbing," contaminating drug samples (including converting negative samples into positive samples), removing drug samples from the lab's evidence locker in violation of protocol, failing to verify the proper functioning of lab equipment, and falsifying reports to hide her misconduct.  See Scott, supra at 339-341.  In addition, Dookhan "acknowledged to investigators that she [might] not be able to identify those cases in which she tested the samples properly and those in which she did not," id. at 339, rendering it virtually impossible to ascertain the full extent of Dookhan's misconduct during her tenure at the Hinton drug lab, which spanned approximately ten years.  There is no indication on the record before us that Farak's misconduct presents a comparable situation.  Therefore, the defendant is not entitled to the benefit of the conclusive presumption articulated in Scott, supra at 352-353, that egregious misconduct by Farak occurred in his case.

---

[14] As far as we can tell, Farak has not provided any details concerning the timing and scope of her misconduct, apart from pleading guilty to the ten indictments.

That said, the systemic nature of Dookhan's misconduct only came to light following a thorough investigation of the Hinton drug lab by the State police detective unit of the Attorney General's office. See Scott, 467 Mass. at 339-341. As far as we are able to discern, no such investigation of the Amherst drug lab has occurred. In another case decided today concerning Farak's misconduct at that facility, Commonwealth v. Ware, ante , (2015), we stated that "the Commonwealth ha[s] a duty to conduct a thorough investigation to determine the nature and extent of [Farak's] misconduct, and its effect both on pending cases and on cases in which defendants already had been convicted of crimes involving controlled substances that Farak had analyzed." The Commonwealth's obligation to conduct an investigation is premised on a prosecutor's "duty to learn of and disclose to a defendant any exculpatory evidence that is 'held by agents of the prosecution team,'" who include chemists working in State drug laboratories. Id., quoting Commonwealth v. Beal, 429 Mass. 530, 532 (1999). It is incumbent on the Commonwealth to perform this duty in a timely fashion. The burden of ascertaining whether Farak's misconduct at the Amherst drug lab has created a problem of systemic proportions is not one that should be shouldered by defendants in drug cases. See generally Scott, supra at 353. At the same time, given what we know, we have no basis for concluding in the present case that

Farak's misconduct is a "lapse of systemic magnitude in the criminal justice system." Id. at 352.

In a related vein, when considering the nexus between the government misconduct and the defendant's case, we agree with the motion judge that, although there is compelling evidence that Farak was stealing cocaine and replacing it with counterfeit substances, the defendant has not shown that Farak's misconduct antedated the entry of his guilty pleas and, therefore, must have occurred in his case. Farak analyzed the drugs in the defendant's case on June 8, 2007. The defendant pleaded guilty to trafficking in cocaine (fourteen to twenty-eight grams) and unlawful possession of ammunition on April 13, 2009. Farak was arrested on January 19, 2013, for misconduct that was alleged to have occurred the previous day. The judge stated that powerful circumstantial evidence suggested that this was not the first time that Farak had tampered with drug samples at the Amherst drug lab. The judge pointed out that the retesting of a small number of drug samples that originally had been analyzed by Farak indicated that she was tampering with evidence during the summer of 2012. Moreover, during the fall of 2012, Farak's coworkers began to observe a change in her behavior, including frequent unexplained absences from her work station and a decrease in productivity. From these facts and all of the physical evidence seized in connection with the

criminal investigation of Farak, the judge concluded that Farak's misconduct postdated the defendant's guilty pleas by almost three years.

The defendant contends that the judge abused his discretion by not considering "strong circumstantial evidence of malfeasance" by Farak dating back to the start of her tenure as an analyst, suggesting a prolonged period of wrongdoing. The defendant posits that Farak must have engaged in misconduct while she was working at the Hinton drug lab from the summer of 2003 until the summer of 2004, see note 1, supra, because her high volume of drug testing rivaled that of Dookhan, who admitted to "dry labbing." The defendant has offered no supporting evidence to substantiate this claim, and, in our view, it is wholly speculative. With respect to Farak's work at the Amherst drug lab, her supervisor testified at the evidentiary hearing, see note 5, supra, that Farak's productivity was comparable to that of her colleague in the lab. The defendant also claims that there was evidence that Farak used cocaine in 2000. Even if that were true, it does not support an inference that Farak must have been tampering with evidence in the Amherst drug lab prior to April 13, 2009. We conclude that the judge did not abuse his discretion in determining that the defendant failed to show that egregious

misconduct by Farak antedated the entry of his guilty pleas and, therefore, must have occurred in his case.[15]

Based on the Ferrara-Scott framework for reviewing a defendant's motion to withdraw his guilty pleas, the defendant here has not satisfied his burden of establishing each element of the first prong of the analysis. That said, it is clear from the record that Farak engaged in egregious misconduct at the Amherst drug lab, and that any deficiencies in the evidence as

---

[15] The defendant also directs our attention to other purported evidence of likely tampering that, in his view, demonstrates that Farak was engaged in misconduct at the Amherst drug lab long before the summer of 2012. In the so-called Finch and Espinosa cases, a Springfield police detective on March 17, 2012, submitted suspected Oxycodone pills to the Amherst drug lab for testing, but, after analysis, Farak concluded that the pills did not contain any controlled substances. In Commonwealth vs. Berube, Hampden Super. Ct., No. 2011-00355 (Oct. 30, 2013), a Springfield police officer testified that not all of the controlled substances presented at the trial were in the same condition as when the officer had seized them. Farak analyzed the substances in that case on May 12, 2011. Similarly, in Commonwealth vs. Carter, Hampden Super. Ct., No. 2010-00115 (Nov. 15, 2013), the evidence presented at the trial (whitish pills) appeared to be different from the evidence that was seized by the police (blue pills). Farak analyzed the substances in that case on December 17, 2009. Finally, photocopies of three newspaper articles about individuals who had been investigated, charged, or sentenced for the illegal possession or theft of controlled substances had been printed from a computer in the fall of 2011 and were found in Farak's vehicle. See note 7, supra. Farak tested the substances in the defendant's case on June 8, 2007. Given that the defendant pleaded guilty on April 13, 2009, and that all of this purported evidence relates to activities that occurred thereafter, it does not support the defendant's contention that Farak's misconduct antedated the entry of his guilty pleas, which is the relevant inquiry under the Ferrara-Scott framework. See Scott, 467 Mass. at 350-354. See also Ferrara, 456 F.3d at 290.

to the scope and timing of her misconduct are attributable to the Commonwealth in light of its failure to conduct a thorough investigation of the matter.  Therefore, "it is incumbent upon us to exercise our superintendence power to fashion a workable approach" for giving defendants whose evidence samples were analyzed by Farak at the Amherst drug lab an opportunity to discover whether, in fact, their cases were affected by her misconduct.  Scott, 467 Mass. at 352.  Clearly, the scope of Farak's misconduct was wider than the ten charges to which she pleaded guilty, given that at least four additional cases have surfaced in which it appears that she tampered with evidence, but with respect to which no charges were filed.

In the absence of a thorough investigation by the Commonwealth into Farak's misconduct, we conclude that the following procedures should be implemented.  In cases where a defendant seeks to vacate a guilty plea under Mass. R. Crim. P. 30 (b) as a result of the revelation of Farak's misconduct at the Amherst drug lab, where the defendant proffers a drug certificate from the defendant's case signed by Farak on the line labeled "Assistant Analyst," and where the drug samples have not yet been destroyed, the defendant is entitled to retest those samples.  Drug samples that are part of a defendant's case are "tangible objects" subject to mandatory discovery under Mass. R. Crim. P. 14 (a) (1) (A) (vii), as amended, 442 Mass.

1518 (2004). See Commonwealth v. Williams, 456 Mass. 857, 870-871 (2010) ("The Commonwealth's responsibility to provide discovery to the defendant extends to material in its possession, custody, or control, and includes information in the possession of persons who have participated in the investigation or evaluation of the case and who report to the prosecutor's office concerning the case"). Cf. Commonwealth v. Mitchell, 444 Mass. 786, 795 (2005) (defendant has "unquestioned right, under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights, to obtain relevant evidence that bears on the question of his guilt or innocence or which otherwise will help his defense"). By such retesting, a defendant can ascertain definitively whether Farak tampered with the drug samples that were used to convict, thereby establishing the requisite "nexus between the government misconduct and the defendant's own case."[16] Scott, 467 Mass. at 351.

More problematic are those cases, like the present one, where a defendant seeks to vacate a guilty plea under rule 30 (b) as a result of the revelation of Farak's misconduct, but the defendant's drug samples have been destroyed. See note 9,

---

[16] General Laws c. 94C, § 47A, requires the Commonwealth to obtain a court order each and every time it wishes to destroy narcotics evidence. Trial judges should be very cautious in allowing motions to destroy such evidence where the narcotics have been analyzed at the Amherst drug lab.

supra.  It is imperative that the Commonwealth thoroughly investigate the timing and scope of Farak's misconduct at the Amherst drug lab in order to remove the cloud that has been cast over the integrity of the work performed at that facility, which has serious implications for the entire criminal justice system. Within one month of the issuance of this opinion, the Commonwealth shall notify the judge below whether it intends to undertake such an investigation.  If so, the investigation shall begin promptly and shall be completed in an expeditious manner.

As just stated, in our view, a thorough and timely investigation would be the appropriate course to follow in the circumstances.  In the absence of such an investigation, however, and where an individual defendant's drug samples have been destroyed, the judge, among other options, may entertain discovery motions to retest randomly selected drug samples that were tested by Farak and are still in existence in an effort to determine whether evidence of tampering can be identified and to establish the time frame of Farak's misconduct.  The results of the Commonwealth's investigation, or the evidence that can be gleaned from retesting, will dictate how the judge shall proceed, and we leave that matter to the judge's discretion.

We reiterate that under the first prong of the Ferrara-Scott analysis, a defendant must show egregious misconduct by the government that preceded the entry of the defendant's guilty

pleas, and occurred in the defendant's case.  See Scott, 467 Mass. at 347-354.  See also Ferrara, 456 F.3d at 290.  In the absence of evidence suggesting a problem of systemic magnitude at the Amherst drug lab, but nonetheless indicating a serious problem of undefined proportions, we afford the defendant here, and others in a similar position, the opportunity to show, through the retesting of drug samples, that Farak's misconduct preceded the entry of his guilty pleas and occurred in his own case.  Satisfaction of the first prong of the Ferrara-Scott analysis is not, however, the end of the judge's inquiry regarding whether to allow the defendant's motion to withdraw his guilty pleas under Mass. R. Crim. P. 30 (b).  We turn now to the second prong of the Ferrara-Scott analysis.

b.  Prong two of the Ferrara-Scott analysis:  material influence on the defendant's decision to plead guilty.  The defendant contends that the judge erred in determining that, even if Farak's misconduct had antedated the defendant's guilty pleas, he still would have entered into the plea agreement.  In the defendant's view, the judge wholly minimized the scope of Farak's misconduct and, as a consequence, improperly assessed its impact on the defendant's decision whether to plead guilty or go to trial.  The Commonwealth acknowledges that the judge denied the defendant's motion to withdraw his guilty pleas in significant part because there was no evidence that the drug

analyses in the defendant's case were inaccurate, or that Farak was involved in misconduct at the time the defendant pleaded guilty.  Notwithstanding evidence of misconduct by Farak, the Commonwealth contends that there were good reasons for the defendant to accept the plea agreement, including the strength of the Commonwealth's case (including the defendant's own incriminating statements), and the significant concessions made by the Commonwealth regarding the charges and defendant's sentence.

In Scott, 467 Mass. at 354, this court pointed out that satisfaction of the first prong of the Ferrara analysis did not "relieve the defendant of his burden under the second Ferrara prong to particularize Dookhan's misconduct to his decision to tender a guilty plea."  See Commonwealth v. Chatman, 466 Mass. 327, 333 (2013) ("The defendant has the burden of proving facts upon which he relies in support of his motion for a new trial"); Commonwealth v. Lewin, 405 Mass. 566, 584-585 (1989) (charges against defendant need not be dismissed where police misconduct was egregious but not prejudicial to fair trial).  The same principle is applicable here with respect to Farak's misconduct. "[E]vidence of the circumstances surrounding [a] defendant's decision to tender a guilty plea should be well within the defendant's reach."  Scott, supra at 354 n.11.  Accordingly, under the second prong of the Ferrara-Scott framework, "the

defendant must demonstrate a reasonable probability that he would not have pleaded guilty had he known of [Farak's] misconduct." Scott, supra at 354-355. See Ferrara, 456 F.3d at 290, 294. This court identified in Scott a number of factors that might be relevant to a defendant's showing under this second prong of analysis. See Scott, supra at 355-356. We emphasized in that case that "the full context of the defendant's decision to enter a plea agreement will dictate the assessment of his claim that knowledge of Dookhan's misconduct would have influenced the defendant's decision to plead guilty." Id. at 357. See Ferrara, supra at 294. Here, the same analysis is applicable.

We recognize that the motion judge considered whether the defendant would have pleaded guilty even if Farak's misconduct had antedated his guilty pleas. However, the judge did so without the benefit of our opinion in Scott, and without our assessment of the potential implications of the Commonwealth's cursory investigation of Farak's misconduct at the Amherst drug lab. In significant part, the judge determined that Farak's misconduct would not have materially influenced the defendant's decision to plead guilty because there was no evidence that the drug analyses in the defendant's case were inaccurate, or that Farak was tampering with evidence at the time the defendant tendered his guilty pleas. Given the absence of a thorough

investigation by the Commonwealth into Farak's misconduct, we cannot ascertain whether the foundation for the judge's resolution of this issue is solid.  Therefore, following his resolution of the first prong of the Ferrara-Scott analysis, the judge should reconsider the second prong of that analysis "to determine whether, in the totality of the circumstances, the defendant can demonstrate a reasonable probability that had he known of [Farak's] misconduct, he would not have [pleaded guilty] and would have insisted on taking his chances at trial." Scott, 467 Mass. at 358.

c.  Subpoena to establish scope and timing of Farak's misconduct.  In an effort to develop the facts necessary to establish the timing and scope of Farak's misconduct, the defendant subpoenaed Farak's spouse, Nikki Lee, to testify at the evidentiary hearing.  See note 5, supra.  The defendant wanted to show that Farak had a history of cocaine use dating back to 2000, and he sought to question Lee about Farak's drug use before and during her employment at the Amherst drug lab. Lee's testimony, in the defendant's view, would be highly probative of when Farak became motivated to tamper with evidence.  In response, Lee filed a notice of her intent to invoke her privilege against self-incrimination under the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights, as well as spousal

privilege under G. L. c. 233, § 20, Second.[17]  Construing Lee's
notice of her intent to invoke certain privileges as a motion to
quash the subpoena, the judge allowed the motion on the basis of
spousal privilege.

On appeal, the defendant contends that the judge erred in
quashing the subpoena because the evidentiary hearing was not a
criminal proceeding against Farak and, therefore, the spousal
privilege was inapplicable.  The propriety of asserting a
testimonial privilege is a matter of statutory interpretation,
presenting a pure question of law that is subject to de novo
review.  See Matter of a Grand Jury Subpoena, 447 Mass. 88, 90
(2006).  See also Bridgewater State Univ. Found. v. Assessors of
Bridgewater, 463 Mass. 154, 156 (2012).  Based on our review, we
agree with the defendant that the spousal privilege was not
applicable in the circumstances of this case.  However, we
affirm the judge's decision on other grounds.  See Commonwealth

---

[17] In her notice of intent to invoke certain privileges,
Nikki Lee also asked that she be excused from testifying at the
evidentiary hearing because, among other reasons, her sworn
testimony before the State grand jury investigating Farak's
misconduct at the Amherst drug lab already had been provided to
the defendant.  Lee testified before the grand jury that she had
tried cocaine, and that she had observed Farak using cocaine in
2000, although not since that time.  We note that the spousal
privilege set forth in G. L. c. 233, § 20, Second, cannot be
invoked in proceedings before a grand jury.  See Matter of a
Grand Jury Subpoena, 447 Mass. 88, 99 (2006).  A spouse who
testifies before a grand jury will not be deemed to have waived
the spousal privilege at a later proceeding because "if there is
no privilege not to testify before a grand jury, then no
privilege has been waived by giving such testimony."  Id. at 98.

v. Va Meng Joe, 425 Mass. 99, 102 (1997) ("An appellate court is free to affirm a ruling on grounds different from those relied on by the motion judge if the correct or preferred basis for affirmance is supported by the record and the findings").

General Laws c. 233, § 20, Second, provides (with certain exceptions not relevant here):  "[N]either husband nor wife shall be compelled to testify in the trial of an indictment, complaint or other criminal proceeding against the other."  See Mass. G. Evid. § 504(a) (2014).  "The purpose of the spousal privilege is to protect the relationship of marriage from the potential harm of one spouse giving adverse testimony against the other."  Commonwealth v. Szerlong, 457 Mass. 858, 869 (2010), cert. denied, 131 S. Ct. 1494 (2011).  See Matter of a Grand Jury Subpoena, 447 Mass. at 96.  Because "[t]estimonial privileges 'are exceptions to the general duty imposed on all people to testify,'" they "must be strictly construed."  Three Juveniles v. Commonwealth, 390 Mass. 357, 359 (1983), cert. denied sub nom. Keefe v. Massachusetts, 465 U.S. 1068 (1984), quoting Commonwealth v. Corsetti, 387 Mass. 1, 5 (1982).  See Matter of a Grand Jury Subpoena, supra at 90.

When considering the meaning of a testimonial privilege, "we look first and foremost to the language of the statute as a whole."  Id.  Generally speaking, the spousal privilege applies to testimony that would be given by one spouse in a criminal

trial against the other spouse.[18]  See id. at 90-93.  Here, Lee would not be testifying at a criminal trial against Farak. Rather, the defendant sought her testimony at an evidentiary hearing pertaining to postconviction motions filed by fifteen defendants who claimed that alleged criminal conduct by Farak rendered their guilty pleas to various drug charges unknowing, unintelligent, and involuntary.  See note 5, supra.  Lee's testimony at such a proceeding cannot be barred by invocation of the spousal privilege under G. L. c. 233, § 20, Second. Accordingly, the judge erred in quashing the defendant's subpoena on this basis.

That said, based on our review of the record, the judge properly could have quashed the defendant's subpoena on the basis of Lee's invocation of her privilege against self-incrimination.[19]  "The proscription of the Fifth Amendment that

---

[18]  In Matter of a Grand Jury Subpoena, 447 Mass. at 99, this court did not decide "whether, or to what extent, the spousal privilege may be invoked in pretrial (or posttrial) proceedings."  Given that the evidentiary hearing at issue in the present case was not a pretrial proceeding against Farak, we do not consider the scope of the spousal privilege beyond the plain language of the statute, which resolves the matter at hand.

[19]  Lee's testimony before the grand jury did not constitute a waiver of her privilege against self-incrimination with regard to the evidentiary hearing.  "The waiver [of a testimonial privilege], once made, waives the privilege only with respect to the same proceeding; the witness may once again invoke the privilege in any subsequent proceeding."  Commonwealth v. King, 436 Mass. 252, 258 n.6 (2002).  See generally Commonwealth v.

'[n]o person . . . shall be compelled in any criminal case to be a witness against himself' may be invoked whenever a witness reasonably believes that the testimony could be used in a criminal prosecution or could lead to other evidence that might be so used." Pixley v. Commonwealth, 453 Mass. 827, 832 (2009), citing Kastigar v. United States, 406 U.S. 441, 444-445 (1972). See Commonwealth v. Baker, 348 Mass. 60, 62-63 (1964). Because the privilege against self-incrimination is a "fundamental principle" of our judicial system, it "is to be construed liberally in favor of" the person claiming it. Commonwealth v. Borans, 388 Mass. 453, 455 (1983). "A witness may refuse to testify unless it is 'perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] cannot possibly have such tendency' to incriminate (emphasis in original)." Commonwealth v. Funches, 379 Mass. 283, 289 (1979), quoting Hoffman v. United States, 341 U.S. 479, 488 (1951).

By subpoenaing Lee, the defendant sought to elicit testimony at the evidentiary hearing regarding Farak's cocaine use before and during her employment at the Amherst drug lab. During her testimony before the grand jury, Lee stated that she herself had tried cocaine, that she had observed Farak using

Martin, 423 Mass. 496, 500-501 (1996) (discussing so-called "waiver by testimony" rule).

cocaine in 2000, and that she had marijuana in her house when police officers arrived to search the premises as part of their investigation of Farak.[20]  To the extent that Lee testified about her own drug possession in relation to that of Farak, it is not "perfectly clear" that such testimony could not possibly have the tendency to incriminate Lee and subject her to criminal prosecution.  Therefore, Lee's invocation of her privilege against self-incrimination would have been a proper basis for the judge to quash the defendant's subpoena.

5. Conclusion.  The order denying the defendant's motion to withdraw his guilty pleas pursuant to Mass. R. Crim. P. 30 (b) is vacated, and we remand this case for further proceedings in accordance with this opinion.

So ordered.

---

[20] The enactment of G. L. c. 94C, § 32L, inserted by St. 2008, c. 387, § 2, decriminalized only the possession of one ounce or less of marijuana.  A defendant still may be criminally charged with possession of more than one ounce of marijuana. See G. L. c. 94C, § 32L, third par.; Commonwealth v. Jackson, 464 Mass. 758, 762 (2013).  Similarly, a defendant may be criminally charged with possession with intent to distribute marijuana, in violation of G. L. c. 94C, § 32C (a), even where the amount of marijuana possessed is one ounce or less.  See Commonwealth v. Keefner, 461 Mass. 507, 508 (2012).