NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12471


COMMITTEE FOR PUBLIC COUNSEL SERVICES & others[1]  vs.  ATTORNEY
GENERAL & others.[2]



Suffolk.    May 8, 2018. - October 11, 2018.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher,
& Kafker, JJ.


Controlled Substances.  Constitutional Law, Conduct of
     government agents.  Due Process of Law, Disclosure of
     evidence, Conduct of prosecutor.  Supreme Judicial Court,
     Superintendence of inferior courts.  Practice, Criminal,
     Conduct of prosecutor, Conduct of government agents,
     Postconviction relief.  Evidence, Certificate of drug
     analysis, Disclosure of evidence.



     Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on September 20, 2017.

_____

     [1] Hampden County Lawyers for Justice, Inc.; Herschelle
Reaves; and Nicole Westcott.

     [2] District Attorney for the Berkshire District, District
Attorney for the Bristol District, District Attorney for the
Cape and Islands District, District Attorney for the Eastern
District, District Attorney for the Hampden District, District
Attorney for the Northern District, District Attorney for the
Norfolk District, District Attorney for the Northwestern
District, District Attorney for the Plymouth District, District
Attorney for the Suffolk District, and District Attorney for the
Middle District.

The case was reported by <u>Gaziano</u>, J.

<u>Rebecca A. Jacobstein</u>, Committee for Public Counsel Services (<u>Benjamin H. Keehn</u>, Committee for Public Counsel Services, also present) for Committee for Public Counsel Services.

<u>Matthew R. Segal</u> (<u>Carlton E. Williams & Daniel N. Marx</u> also present) for Hampden County Lawyers for Justice, Inc., & others.

<u>Thomas E. Bocian</u>, Assistant Attorney General (<u>Anna E. Lumelsky & Thomas A. Caldwell</u>, Assistant Attorney General) for Attorney General.

<u>Joseph A. Pieropan</u>, Assistant District Attorney (<u>Susanne M. O'Neil, Hallie White Speight, Shoshana Stern, & Sara Concannon DeSimone</u>, Assistant District Attorneys, also present) for District Attorney for the Berkshire District & others.

The following submitted briefs for amici curiae:

<u>Jessica Ring Amunson</u>, of the District of Columbia, <u>& Andrew C. Noll</u> for Legal Ethics and Criminal Justice Scholars & another.

<u>Douglas I. Koff</u>, of New York, <u>Adam S. Hoffinger & Nicholas A. Dingeldein</u>, of the District of Columbia, <u>& Radha Natarajan</u> for The Innocence Project, Inc., & another.

<u>David M. Siegel & Elizabeth A. Ritvo</u> for Boston Bar Association.

<u>Clark M. Neily, III, & Jay R. Schweikert</u>, of the District of Columbia, <u>Monica Shah, & Emma Quinn-Judge</u> for Cato Institute & another.

<u>Steven Fitzgerald</u>, pro se.

GAZIANO, J.  We are called upon, in the exercise of our broad powers of superintendence over the courts of the Commonwealth, to remedy egregious governmental misconduct arising out of the scandal at the State Laboratory Institute in Amherst at the campus of the University of Massachusetts (Amherst lab or lab).  The misconduct at issue involves evidence tampering by a chemist, Sonja Farak, who stole drugs submitted to the lab for testing for her own use, consumed drug

"standards" that are required for testing, and manipulated evidence and the lab's computer system to conceal her actions. The government misconduct at issue also involves the deceptive withholding of exculpatory evidence by members of the Attorney General's office, who were duty-bound to investigate and disclose Farak's wrongdoing.

This is our third decision addressing the Amherst lab scandal. See Commonwealth v. Cotto, 471 Mass. 97 (2015); Commonwealth v. Ware, 471 Mass. 85 (2015). Three years ago, we considered evidence that Farak had stolen portions of samples from a handful of cases that had been submitted to the lab for analysis. See Cotto, supra at 109-110. Based on the reported limited scope of Farak's misconduct, we concluded that evidence tampering at the Amherst lab did not constitute "a systemic problem" warranting extraordinary relief. Id. at 110. We also expressed our dissatisfaction with the Commonwealth's "cursory at best" investigation into the timing and scope of Farak's misconduct. Id. at 111-112. We remanded the matter to the Superior Court to provide the Commonwealth an opportunity to fulfil its duty to "learn of and disclose . . . any exculpatory evidence that is held by agents of the prosecution team, who include chemists working in State drug laboratories" (citation and quotations omitted). Id. at 112, 120.

On remand, on December 7, 2015, the Chief Justice of the Superior Court appointed Superior Court Judge Richard J. Carey to hear all cases arising from Farak's misconduct. In December, 2016, Judge Carey conducted an evidentiary hearing over six days, after which he found that the government had vastly understated the extent of Farak's misconduct. Moreover, he determined that two assistant attorneys general had perpetrated a "fraud upon the court" by withholding exculpatory evidence and by providing deceptive answers to another judge in order to conceal the failure to make mandatory disclosure to criminal defendants whose cases were affected by Farak's misconduct. The judge determined that certain cases in which Farak had signed a certificate of drug analysis (drug certificate) during her employment at the Amherst lab were subject to dismissal. He found further, however, that Farak's misconduct had not undermined testing results reported by other chemists who had been assigned to the Amherst lab during the period that Farak was employed there.

The petitioners -- the Committee for Public Counsel Services; Hampden County Lawyers for Justice, Inc.; and two named former criminal defendants -- sought relief in the county court through a petition pursuant to G. L. c. 211, § 3, and G. L. c. 231A, § 1, claiming that the misconduct by the district attorneys and members of the Attorney General's office required

the imposition of a "global remedy." The petitioners requested that the single justice construct a "global remedy" by vacating and dismissing all convictions tainted by the Commonwealth's misconduct. More particularly, the petitioners argued that all drug convictions in which the samples had been tested by the Amherst lab during Farak's almost nine-year tenure should be vacated and dismissed. In addition, the petitioners asked the single justice to exercise the court's superintendence authority and to issue prophylactic standing orders designed to ensure that, in the future, the Commonwealth timely discloses exculpatory evidence, and that procedures are in place to prevent a recurrence of a similar situation.

Following a number of hearings, the district attorneys agreed to the vacatur and dismissal of approximately 8,000 cases in which Farak had signed a drug certificate. Two district attorneys did not agree to dismissal of all charges, in their respective counties, in which Farak had signed the drug certificate. The single justice reserved and reported the matter to the full court, and issued three questions for the parties to answer in their briefs. The reported questions asked:

> "1. Whether the defendants in some or all of the 'third letter' cases are entitled to have their convictions vacated, and the drug charges against them dismissed with prejudice, given the undisputed misconduct of the assistant Attorneys General found by Judge Carey in Commonwealth vs.

Erick Cotto, Hampden Sup. Ct., No. 2007-770 (June 26, 2017) (memorandum and order on postconviction motions), and given the conduct of the District Attorneys that the petitioners allege was improper.

"2. Whether the definition of 'Farak defendants' being employed by the District Attorneys in this case is too narrow; specifically, based on the material in the record of this case, whether the appropriate definition of the class should be expanded to include all defendants who pleaded guilty to a drug charge, admitted to sufficient facts on a drug charge, or were found guilty of a drug charge, if the alleged drugs were tested at the Amherst Laboratory during Farak's employment there, regardless [of] whether Farak was the analyst or signed the certificates in their cases.

"3. Whether, as the petitioners request, the record in this case supports the court's adoption of additional prophylactic measures to address future cases involving widespread prosecutorial misconduct, and whether the court would adopt any such measures in this case."

After the matter had been reported to the full court, the district attorneys agreed to dismiss all of the so-called "third letter"[3] cases in which Farak had signed the drug certificates, rendering moot the first reported question.

Before this court, however, the respondent district attorneys contest the relief sought by the petitioners: dismissal of all cases where the drug samples had been tested by the other chemists who worked at the Amherst lab during Farak's tenure. The district attorneys argue that there is no factual

---

[3] "Third letter" cases are "cases that the District Attorneys intend to re-prosecute if motions for new trial are allowed, and that they represent can be prosecuted independently of any drug certificate signed by Farak, or related testimony." See Bridgeman v. District Attorney for the Suffolk Dist., 476 Mass. 298, 328 (2017).

basis for a conclusion that Farak's misconduct compromised the analyses performed by other chemists at the Amherst lab, and that prosecutorial misconduct does not merit dismissal of such a large group of cases as is at issue here. In addition, the district attorneys contend that existing rules of criminal procedure and professional conduct are adequate to ensure that prosecutors disclose exculpatory evidence and do so in a timely manner.

The respondent Attorney General contests the petitioners' proposed remedy, as well as the result suggested by the district attorneys. The Attorney General proposes a different remedy. Based on Farak's admission that she began to tamper with other chemists' samples in the summer of 2012, the Attorney General contends that those defendants whose drug samples were tested between June, 2012, and Farak's arrest in January, 2013, should be offered the opportunity to obtain relief under the protocol established by this court in Bridgeman v. District Attorney for the Suffolk Dist., 476 Mass. 298, 316-317 (2017) (Bridgeman II).

We conclude that Farak's widespread evidence tampering has compromised the integrity of thousands of drug convictions apart from those that the Commonwealth has agreed should be vacated and dismissed. Her misconduct, compounded by prosecutorial misconduct, requires that this court exercise its superintendence authority and vacate and dismiss all criminal

convictions tainted by governmental wrongdoing.  While dismissal with prejudice "is a remedy of last resort," it is necessary in these circumstances (citation omitted).  Id. at 316.  No other remedy would suffice in this case, where the governmental misconduct was "egregious, deliberate, and intentional," and resulted in a violation of constitutional rights that "give[s] rise to presumptive prejudice" (citation omitted).  Id.

Accordingly, to answer the second reported question, we rely on evidence that Farak's misconduct between 2004, when she began working at the Amherst lab, and the end of 2008 was limited to stealing from a methamphetamine standard, and that, in 2009, she began stealing from police-submitted samples and otherwise engaging in widespread evidence tampering.  Thus, we define the term "Farak defendant" to include, in addition to those defendants whose drug certificate was signed by Farak (and whose convictions have been vacated), (1) those individuals who were convicted of methamphetamine offenses during Farak's tenure at the Amherst lab; and (2) those individuals whose convictions were based on drugs tested in the Amherst lab on or after January 1, 2009, and through January 18, 2013, the date the lab closed, regardless of who signed the drug certificate of analysis.

In response to the third reported question, we ask this court's standing advisory committee on the rules of criminal

procedure to draft proposed amendments to rule 14 of the Massachusetts Rules of Criminal Procedure to better define the prosecutor's absolute duty to disclose exculpatory evidence in a timely manner.[4]

Background.  The following facts are drawn from the findings by Judge Carey in his exhaustive, 127-page memorandum and order on the petitioners' motions to dismiss or for postconviction relief, based on the evidence before him at the six-day hearing.

1.  Amherst lab.  In the 1960s, the Department of Public Health (DPH) began operating a laboratory for drug testing on the campus of the University of Massachusetts at Amherst.  The State police took over operation of the lab in July, 2012, and oversaw the lab until its closure on January 18, 2013.  The Amherst lab served as a satellite laboratory for DPH's William A. Hinton State Laboratory Institute (Hinton lab), which was located in the Jamaica Plain area of Boston.  By 1987, the Amherst lab's primary function was the analysis of suspected controlled substances submitted by law enforcement agencies in western Massachusetts.

---

[4] We acknowledge the amicus briefs submitted by the Boston Bar Association; the Cato Institute and the Center on the Administration of Criminal Law; The Innocence Project, Inc., and the New England Innocence Project; Legal Ethics and Criminal Justice Scholars and the DKT Liberty Project; and Steven Fitzgerald.

From at least 2008 until the closure of the Amherst lab, four employees were assigned to it.  These were chemists Farak and Rebecca Pontes; supervisor James Hanchett; and evidence officer Sharon Salem.  The Amherst lab was "more laid back [than the Hinton lab]," and had "basically . . . no oversight."  Farak and Pontes, for example, occasionally would assign evidence samples if the evidence officer was not in the office, and every employee had unfettered access to drug standards, police-submitted samples, and the computer inventory system.  Between 2006 and July, 2012, officials from DPH visited the Amherst lab only once or twice.

2.  Farak's employment.  Farak was hired in May, 2003, as a Chemist I at the Hinton lab; she transferred to the Amherst lab in August, 2004.  Farak worked as a chemist at the Amherst lab until the lab closed on January 18, 2013.  The supervisor who preceded Hanchett indicated on Farak's annual personnel reviews from 2004 to 2008 that she was a thorough analyst with high output, who met or exceeded expectations in all performance criteria.  In June, 2005, DPH promoted Farak to Chemist II, and she was assigned additional responsibilities, including testing larger and more complex samples and repairing equipment. Hanchett assumed supervision of the Amherst lab in June, 2008, and discontinued the practice of conducting annual performance reviews.  He and Farak's other coworkers believed that,

throughout most of her employment, Farak was an excellent, meticulous chemist.

3. Misuse of lab samples. Farak began using alcohol and marijuana regularly around the year 2000, while she was in her first year of a Ph.D. program. She occasionally experimented with other drugs, including cocaine, methylenedioxy methamphetamine (also known as "MDMA" or "Ecstasy"), and heroin.

At some point in late 2004 or early 2005, after transferring to the Amherst lab, Farak discovered a large bottle of methamphetamine oil in the unlocked refrigerator that held as many as fifty standards.[5] She used a pipette to remove some of the methamphetamine from the bottle and squirted it into her mouth. The methamphetamine gave her increased energy and alertness, providing "the pep [she had] been looking for." She later testified that she "felt amazing" when using

---

[5] As used in a drug laboratory, a "standard" is a known controlled substance (e.g., cocaine or heroin) against which an unknown sample submitted by a law enforcement officer is compared to determine its identity. Using a gas chromatographer/mass spectrometer, a chemist compares the mass spectral patterns of the tested sample and the standard to determine if there is a match.

Two types of standards are used in this testing. "Primary" standards are pure drug samples acquired from pharmaceutical companies, and are considered much the better practice. "Secondary" standards are manufactured in a laboratory from police-submitted samples that tested positive for a controlled substance, and were purified to remove any adulterants. Due to budget constraints, the Amherst lab regularly used secondary standards until July, 2012, when the State police assumed control of the lab.

methamphetamine. Within a short period of time, Farak was stealing and consuming portions of the methamphetamine standard every morning. By 2009, her consumption had increased to several times per day. She was under the influence of methamphetamine much of the time she was at work, including days when she testified in court.

By the end of 2008 or early 2009, Farak had almost completely exhausted the methamphetamine standard. Around the same time, Hanchett was planning to conduct an audit of the lab; Farak became "slightly paranoid" that he would notice that the amount of methamphetamine oil in the jar had decreased substantially. To avoid this eventuality, she added water to the jar. Thereafter, Farak began searching for other standards to use. She discovered a "large jar" of amphetamine and "a couple smaller containers of phentermine," and she began to consume these drugs. Additionally, throughout 2009, Farak also stole from the lab standards for ketamine, MDMA, methylenedioxy ethylamphetamine (MDEA), lysergic acid diethylamide (LSD), and cocaine.

In early 2009, Farak also began substance abuse counselling. At first, she declined to answer questions about her drug use. On April 28, 2009, she admitted to her therapist that she had been using illegal drugs for a long period of time, and that she "obtain[ed] the drugs from her job at the [S]tate

drug lab, by taking portions of samples that [had] come in to be tested." Farak explained that she initially had begun by taking relatively small amounts from police-submitted samples that fell within the "acceptable loss" of approximately five per cent that ordinarily could be depleted due to testing and evaporation in storage. On August 25, 2009, Farak told her therapist that she was "almost out" of her drug supply.

Farak later explained to her therapist that, in late 2009, she had stolen cocaine from a large batch of samples submitted by inspectors for the United States Postal Service, and maintained that that was the first time she had tampered with a submitted sample. She recalled the sample clearly because of its size and its source, but also because that had been the first time that she had crossed a line into a new level of lab misconduct. According to Farak, "taking from . . . evidence [was] a whole []other level of morality [she] never thought [she] would cross and [she] did and it scared [her]."

In 2011, Farak's cocaine use increased at the same time that she used up lab standards; in response, she turned to police-submitted samples of powder and "crack" cocaine. By the end of 2011, Farak was "totally controlled by [her] addiction." Throughout 2012, she was smoking crack cocaine ten to twelve times per day, both when she was at work and at home and while driving. Farak smoked crack cocaine in the bathroom of the lab,

at her lab bench when no one else was around, in the evidence room, and in the lab's fume hood so that she could "get rid of . . . the smoke directly."[6]

To hide her burgeoning drug use from her colleagues, Farak began to counterfeit crack cocaine using a variety of substances, including rocks, soap chips, candle wax, and modeling clay, and to manipulate the inventory list on the evidence computer.  By the end of 2011, Farak routinely manipulated the computer system to assign herself the samples that she wanted.  If she skimmed from a sample before it was assigned to anyone, she altered the gross weight on the drug receipt so that the chemist who tested the sample would not notice; following analysis, she changed the weight back to the original amount so that the investigating officers would be unaware of the tampering.  Farak also lowered the temperature on the heat sealers, so that samples brought in unsealed could not be sealed properly, thereby allowing her easier access without noticeable tampering.

In one illustrative case, Farak removed "a good hundred grams" from a kilogram of cocaine that had been submitted by the Chicopee police department.  Unsure whether the missing one hundred grams would be noticed, Farak replaced the missing

---

[6] When crack cocaine was not readily available, Farak manufactured it at her work station, using powder cocaine.

volume with a mixture of baking powder and baking soda.  On another occasion, she removed 200 grams of powder cocaine from a Holyoke case and took the drugs home to cook into crack cocaine.

Judge Carey noted that Farak testified at the grand jury that "she began taking other chemists' samples in the summer of 2012."  Farak testified that she took approximately six of Hanchett's samples of crack cocaine from his work station. These samples included "3.5 grams submitted by the Northampton Police Department, and a 24.5 gram sample from the Pittsfield Police Department."  Farak replaced the crack cocaine with counterfeit substances and placed the samples in bags that Hanchett had pre-initialed to save time.  Farak testified that, on another occasion, she took thirty grams of cocaine from a seventy-three-gram Springfield police department submission that had been assigned to Pontes.  She used it to manufacture crack cocaine, and replaced the missing cocaine with a filler substance.

After the State police assumed control of the Amherst lab in July, 2012, their quality assurance team instructed Hanchett to inventory the lab standards.  At that point, Hanchett noticed that the standards were more depleted than he had expected, and mentioned that observation to Salem, Pontes, and Farak.  In September or October, 2012, Hanchett noticed that Farak's productivity had dropped, and he encouraged her to focus on her

work.  Aside from this single comment by Hanchett, and despite Farak's almost daily drug use starting in 2004, her coworkers did not question her work.  State police team members who met with Farak also did not notice that she was under the influence of drugs.

4.  Farak's arrest.  On January 17, 2013, Salem was matching drug certificates to corresponding samples and noticed that two samples were missing.  She determined that both samples had been assigned to Farak, who had identified them as cocaine. The next morning, Salem told Hanchett about the missing samples. Hanchett searched the lab and discovered at Farak's work station an envelope containing the cut-open packaging for the missing samples, as well as materials Farak used as fillers to create counterfeit drugs.  The substances in the packaging tested negative for cocaine.  Hanchett notified the lab director, State police Major James Connolly, who instructed Hanchett to close the lab immediately.[7]  State police officers then alerted the office of the Attorney General.

On the morning of January 18, 2013, Farak was expected to testify in a case in which she had issued a drug certificate.

---

[7] Hanchett's discovery took place four months after Annie Dookhan, a former chemist at the Hinton lab, had been arrested for evidence tampering and obstruction of justice.  See Commonwealth v. Scott, 467 Mass. 336, 337, 339 (2014).  By that time, the Hinton lab had been closed due to Dookhan's misconduct.  See id. at 342.

Two State police detectives located her at the court house and interviewed her. Following the interview, Farak refused to consent to a search of her vehicle; the vehicle was seized and towed to the garage at the State police barracks.

On January 19, 2013, Farak was arrested on charges of tampering with evidence, possession of cocaine, and possession of heroin. On the same day, a clerk-magistrate issued a warrant to search Farak's vehicle. Detective Lieutenant Robert Irwin, Sergeant Joseph Ballou, and Trooper Randy Thomas, who were assigned to the Attorney General's office, executed the search warrant; a crime scene services officer photographed the vehicle and the evidence found within it. Among other things, the officers discovered bags containing pills, a white powdery substance that resembled cocaine, a brown tar-like substance that resembled heroin, and crack cocaine. The vehicle also contained empty evidence bags marked with Hanchett's initials, and a sheet of paper that bore repeated written instances of Pontes's initials. In addition, there were multiple manila envelopes containing hundreds of pages marked with case numbers, some dating back to 2008. Given time restraints and the sheer volume of documents, the initial search warrant return listed the folders and documents as "assorted lab paperwork"; the officers intended to examine the evidence more closely at a later time.

On January 25, 2013, investigators also executed a search warrant for Farak's duffel bag, which was found at the Amherst lab, and discovered substances that could be used to create counterfeit cocaine, including soap, baking soda, candle wax, off-white flakes, and modeling clay, as well as plastic lab dishes, wax paper, and fragments of a crack cocaine pipe.  In addition, they found empty evidence bags that had been cut open; one bag was labeled with Pontes's initials, and two were labeled with Farak's initials.  On January 28, 2013, State police searched Farak's work station and found a vial of white powder that tested positive for oxycodone; they also found 11.7 grams of cocaine in one of her desk drawers.

Assistant Attorney General Anne Kaczmarek was assigned to prosecute the case against Farak.  As with the Attorney General's investigation and prosecution of former DPH chemist Annie Dookhan, the Attorney General's office agreed to provide the district attorneys with information as the case unfolded. The district attorneys, in turn, were required to provide any such discovery to defendants whose convictions were called into question by Farak's misconduct.

5. Attorney General's investigation.  The Attorney General's office initially assumed that Farak's misconduct had been limited to the six-month period of time immediately preceding her arrest, and had consisted of stealing cocaine

samples for her own use, because of her addiction. An inventory conducted at the time of Farak's arrest revealed only four missing samples, whereas an inventory that had been conducted four months earlier had not uncovered any missing samples.

Judge Carey found that the "assumption [concerning the time frame of the misuse] was at odds with the evidence uncovered even at that early juncture." By the end of January, 2013, the evidence indicated that "(1) Farak was addicted to and had stolen from the lab cocaine, phentermine, oxycodone[,] and possibly heroin; (2) her misconduct occurred as early as 2011; and (3) she may have tampered with samples assigned to Pontes and Hanchett, as she inexplicably had [evidence] bags with their initials on them."

On January 23, 2013, Ballou received information from the district attorney for the Hampden district concerning two cases in which Farak had tested samples and the district attorney later had discovered inconsistencies. In one case, a Springfield narcotics officer indicated that he had submitted for analysis fifty-one pills that resembled oxycodone; when he retrieved the sample after testing, it contained sixty-one pills with a different color and different markings. Farak, who signed the drug certificate, had indicated on the certificate that the sample contained no illegal substances. In the other case, Farak certified the weight of a sample of cocaine as four

grams less than the weight recorded by police after it had been seized. When Ballou brought these cases to Kaczmarek's attention, she dismissed the importance of the missing prescription pills by stating, "Please don't let this get more complicated than we thought. If she were suffering from back injury -- maybe she took some oxys?"

Upon further review of the documents found in Farak's vehicle, Ballou discovered that the "assorted lab paperwork" contained mental health records. These records were significant because they "(1) disclosed Farak's admission of drug use and theft of police-submitted samples while she was working at the lab; (2) supported inferences that Farak's misconduct occurred as early as 2011; and (3) revealed that Farak was receiving treatment for drug addiction and that her treatment providers likely would have more information about the scope of Farak's drug use and theft at the lab."

On February 14, 2013, Ballou sent an electronic mail message titled "FARAK Admissions" to Kaczmarek, Irwin, and John Verner, who was then chief of the criminal bureau for the office of the Attorney General. The text of the message provided, "Here are those forms with the admissions of drug use I was talking about. There are also news articles with handwritten comments about other officials being caught with drugs. All of these were found in her car inside of the lab manila envelopes."

Ballou attached the documents he had found to his message.  Both Kaczmarek and Verner were aware of the admissions before receiving Ballou's message.

In preparation for grand jury proceedings, Kaczmarek drafted a prosecution memorandum that referenced the mental health records, with a footnote stating, "These [records] were not submitted to the grand jury out of an abundance of caution, in order to protect possibly privileged information."  The memorandum noted that the Attorney General's office was not certain of the scope of Farak's misconduct, and that staff were "hoping that the defendant, once indicted, [would] detail how long she had been abusing drugs and how many cases are affected."  Verner and Dean Mazzone, then senior trial counsel for the criminal bureau, each reviewed and approved the memorandum.  Verner wrote a comment near the footnote noting that the mental health records had "not [been] turned over to [the district attorney's] [o]ffice yet."

On April 1, 2013, a grand jury returned indictments charging Farak with four counts of evidence tampering, four counts of theft of a controlled substance, and two counts of unlawful possession of cocaine.  When Farak was arraigned on April 22, 2013, Kaczmarek provided her defense attorney with the entire file, including the mental health records.  Later, Kaczmarek told Farak's attorney that the Attorney General's

office considered the mental health records to be privileged and, therefore, would not turn them over to defendants challenging their convictions on the ground of Farak's misconduct.

Kaczmarek sent an electronic mail message to Farak's attorney on September 10, 2013, asking if Farak would be willing to make a proffer to determine the scope of the misconduct. The attorney responded that Farak would cooperate if she were to receive a sentence of probation and immunity for additional State and Federal charges. The Attorney General's office declined to accept the offer. On January 6, 2014, Farak pleaded guilty to all of the charges.

6. Amherst lab defendants. While the Attorney General's office focused on prosecuting Farak, defendants whose drug certificates had been signed by Farak began to file motions for discovery and postconviction relief. On July 25, 2013, then Superior Court Judge C. Jeffrey Kinder consolidated sixteen postconviction claims, involving fifteen defendants. He conducted an evidentiary hearing on the consolidated cases over three days in September and October of 2013. Another defendant, who had filed a motion to dismiss as part of his pretrial proceedings, also participated in the hearing. Judge Kinder limited the hearing to information concerning (1) the timing and scope of Farak's misconduct; (2) the State police's quality

assurance audit from October, 2012; and (3) how Farak's misconduct and the conditions at the Amherst lab might have had an impact on the results of drug analyses the lab produced. Judge Kinder also designated two attorneys as lead counsel for the defendants.

From August through October, 2013, numerous defendants served subpoenas duces tecum on Ballou and Kaczmarek and filed motions in the Superior Court seeking to inspect the evidence seized from Farak's vehicle. They also sought disclosure of the Attorney General's office correspondence relating to the scope of Farak's misconduct and any indication that a third party had had knowledge of Farak's behavior prior to her arrest. Assistant Attorney General Kris Foster, a member of the appeals division of the criminal bureau, was assigned to respond to the subpoenas and motions.

a. Subpoenas. After communicating with her superiors, Foster filed motions to quash the subpoenas. She argued that the Attorney General's office already had turned over all nonprivileged information. In the alternative, Foster asked the court to restrict the scope of the subpoenas by allowing the government not to produce documents that contained the criminal history of any individual, legal work product, or "[i]nformation concerning the health or medical or psychological treatment of individuals." Although internal policies for responding to

subpoenas indicated that a review of the file should be the first step in responding to a request for a subpoena, and a supervisor urged her to confirm the accuracy and truth of her representations about the contents of the file, Foster did not personally review Ballou's file.

On September 9, 2013, Judge Kinder denied the motion to quash the Ballou subpoenas insofar as the documents related to Ballou's testimony at the evidentiary hearing.  When he inquired of Foster concerning the Attorney General's office's request for a protective order, she explained that she had not personally reviewed the file and that neither she nor Ballou had brought the file to the hearing.  Judge Kinder instructed Foster to examine Ballou's file by September 18, 2013, and to present to him for in camera review on that date any material the Attorney General's office believed was privileged.  In electronic mail messages among Foster, Kaczmarek, and Verner discussing the hearing, Kaczmarek indicated that Ballou's file contained the news articles and mental health records seized from Farak's vehicle.

On September 16, 2013, Foster sent Judge Kinder a letter stating, "After reviewing Sergeant Ballou's file, every document in his possession has been disclosed.  This includes grand jury minutes and exhibits, and police reports.  Therefore, there is nothing for the Attorney General's office to produce for your

review on September 18, 2013." At that point, however, Foster had yet to review Ballou's file, and she intentionally had used the passive phrase "after review" so that she would not directly misrepresent to Judge Kinder that she had personally examined the file. At a subsequent hearing on October 2, 2013, Foster again represented to Judge Kinder that the entire contents of Ballou's file had been disclosed.

b. Motions to inspect. Within the same time frame, one of the appointed defense counsel, Luke Ryan, asked the Attorney General's office for permission to inspect the documents; as the investigation was still ongoing, Kaczmarek refused. Kaczmarek again rejected Ryan's efforts to examine the documents after Ryan received permission from Hampden County Assistant District Attorney Frank Flannery, who was in charge of the protocol for handling the Amherst lab defendants' cases. At the hearing on September 9, 2013, Ryan asked Judge Kinder for an order allowing him access to the documents. Judge Kinder told Ryan that he could file a motion for access if he were unable to make arrangements with the Attorney General's office. Over the next few days, Ryan sent Foster electronic mail messages asking for permission to review the documents. Kaczmarek told Foster not to allow these requests, because the documents were not relevant to Ryan's case.

Ryan then filed a motion to inspect, pursuant to Mass. R. Crim. P. 17 (a) (2), 378 Mass. 885 (1979). At a hearing on the motion on October 2, 2013, Foster told Judge Kinder that the documents sought were not relevant, and that the Commonwealth would be prejudiced by the number of defendants who would seek to review them. Concluding that he was "not persuaded that Rule 17 (a) (2) permits a third-party to inspect evidence held in a pending criminal case . . . [p]articularly under the circumstances of this case where the physical evidence has been described in detail for the defendant and photographs of that evidence have been provided," Judge Kinder denied the motion to inspect.

c. <u>Motions to compel</u>. A different defendant filed a motion to compel production by the Attorney General's office of "copies of all inter and intra-office correspondence from 1/18/13 to present pertaining to the scope of evidence tampering and/or deficiencies at the Amherst drug lab." Foster asserted in response that such correspondence was protected by the work product doctrine. At the hearing on October 2, 2013, Foster told Judge Kinder that she had not personally examined the correspondence, and she agreed that the requested information would be exculpatory if it existed. Judge Kinder allowed the motion to compel. The Attorney General's office then filed a motion for clarification and requested that privileged work

product and material related to an ongoing investigation be excluded; Judge Kinder allowed that motion, and limited the scope of his earlier motion as the office of the Attorney General had requested.

Another motion to compel, filed by a different defendant, requested "any and all evidence suggesting that a third party may have been aware of Farak's evidence tampering at the Amherst lab prior to Farak's arrest in January 2013." Although the mental health records were responsive to this discovery motion, Foster again responded that the Attorney General's office had turned over all materials, and claimed that "there [was] no reason to believe that a third-party had knowledge of Farak's alleged malfeasance prior to her arrest." Had the documents been produced, they would have revealed that Farak's mental health care providers knew of her evidence tampering as early as 2011. Judge Kinder denied the motion.

d. <u>Judge Kinder's findings</u>. Relying on representations made by the Attorney General's office, Judge Kinder concluded that Farak's misconduct began in July, 2012, and ended with her arrest in January, 2013. He found that although Farak had been an agent of the Commonwealth, there was insufficient evidence that her misconduct began earlier than July, 2012, and that any other deficiencies at the Amherst lab did not have an impact on the reliability of her testing. As a result, Judge Kinder

denied the motions for postconviction relief by defendants who had pleaded guilty before the summer of 2012; he also denied the motion to dismiss filed by the defendant who was still in the pretrial phase. Defendants whose motions were denied, and other defendants who had not been part of the hearings before Judge Kinder but who had filed motions which subsequently were denied on the basis of his rulings, appealed. See Cotto, 471 Mass. at 99; Ware, 471 Mass. at 91-92.

7. Discovery of the mental health records. In March, 2014, following Farak's guilty plea, an Amherst lab defendant filed a motion to inspect the evidence from Farak's criminal case. Ryan sent an electronic mail message to Foster on June 23, 2014, on behalf of another defendant, asking for permission to view that evidence; the message was unanswered. On July 21, 2014, that defendant filed a motion for an order to allow Ryan to inspect the evidence. The motion was allowed on July 31, 2014.

On October 30, 2014, Ryan reviewed the evidence and discovered multiple documents that had not been disclosed previously, including the mental health records. On November 1, 2014, Ryan sent a letter titled "Newly Discovered Evidence" to Assistant Attorney General Patrick Devlin, who had helped to arrange the inspection. Ryan indicated that he had discovered proof that Farak had been abusing drugs since at least 2011, in

contrast to Judge Kinder's findings, which were based on the Attorney General's office's representations that Farak's drug abuse and tampering with Amherst lab samples began in July of 2012. Ryan indicated that "[i]t would be difficult to overstate the significance of these documents." He asked Devlin to allow him to provide the mental health records to another attorney and to other defendants who had sought postconviction relief based on Farak's misconduct.

On November 5, 2014, Foster sent an electronic mail message to Devlin, requesting a copy of the mental health records, which she had never seen. In a letter dated November 13, 2014, the Attorney General's office notified the district attorneys that it was sending 289 pages of documentary evidence that had not been turned over previously, including the mental health records.

8. Decisions in Cotto and Ware. In December, 2014, this court received filings from two defendants whose appeals from the denials of their motions for postconviction relief were then pending. See Cotto, 471 Mass. at 97; Ware, 471 Mass. at 85. The defendant in Cotto, supra at 99, directly appealed from Judge Kinder's ruling, and sought to withdraw the defendant's guilty pleas. He claimed that Farak's misconduct predated his guilty pleas in April, 2009, and that he would not have pleaded guilty if he had been aware of the misconduct. Id. at 98-99.

The defendant in Ware, supra at 90-92, sought postconviction discovery and retesting of suspect drug samples; he argued that allowance of his discovery request would be "reasonably likely to uncover evidence that might warrant granting [him] a new trial." In addition, he questioned the thoroughness of the investigation by the Attorney General's office into the scope of Farak's misconduct. See id. at 92.

On the basis of Judge Kinder's findings, and the eight cases of tampering that had surfaced at that point, we determined that "the scope of Farak's misconduct [did] not appear to be . . . comparable to the enormity of Dookhan's misconduct." See Cotto, 471 Mass. at 111. We therefore declined to extend the conclusive presumption of egregious government misconduct that was applicable in cases affected by Dookhan's misconduct. See id., citing Commonwealth v. Scott, 467 Mass. 336, 352-353 (2014). We noted, however, "the Commonwealth's failure to thoroughly investigate the matter of Farak's misconduct," see Cotto, supra at 99, and indicated that it was "imperative that the Commonwealth thoroughly investigate the timing and scope of Farak's misconduct at the Amherst drug lab in order to remove the cloud that has been cast over the integrity of the work performed at that facility, which has serious implications for the entire criminal justice system." Id. at 115. See Ware, 471 Mass. at 96. We allowed the

Commonwealth one month to decide whether to undertake an investigation. Cotto, supra. In June, 2015, the Attorney General's office notified the Superior Court in Hampden County that it would do so.

9. Velis and Caldwell Reports. Following this court's remand and prior to the hearing before Judge Carey, the Attorney General's office conducted its own investigation of the situation at the Amherst lab. In June, 2015, the Attorney General appointed retired Judge Peter A. Velis as a special assistant attorney general and independent investigator to work with Assistant Attorney General Thomas A. Caldwell. In August, 2015, the district attorney for the northwestern district separately appointed retired Judge Thomas T. Merrigan as a special assistant district attorney and independent investigator for the northwestern district. The two judges then consolidated their investigation, which was focused on issues raised by Ryan. Two State police investigators were assigned to assist the judges with the investigation of allegations of misconduct by State police officers and prosecutors assigned to the office of the Attorney General.

In September, 2015, the Attorney General's office also undertook to examine the scope of Farak's misconduct and initiated two grand jury investigations, in Hampshire and Suffolk Counties, to hear evidence. Caldwell was assigned to

conduct the investigations. Farak testified before the Hampshire County grand jury, over three days, concerning her extensive drug use, theft of standards and police-submitted samples, tampering with other chemists' samples, and manufacturing of crack cocaine at her workbench.[8]

In November, 2015, Hanchett, Salem, and Pontes testified before the Suffolk County grand jury concerning conditions at the Amherst lab and their interactions with Farak. The Attorney General's office also reviewed and introduced more than 4,700 electronic mail messages that Caldwell had obtained from multiple sources; the Amherst lab records; and Farak's bank records, telephone records, and communications while being held in a house of correction awaiting trial.

On March 31, 2016, Judges Velis and Merrigan issued a report which concluded,

> "After our thorough review of the investigative activities and their recommendations, we agree that there is no evidence of prosecutorial misconduct or obstruction of justice by the Assistant Attorney[s] General[] and [State police] officers in matters related to the Farak case."

On April 1, 2016, Caldwell submitted his completed report (Caldwell Report) to Judge Carey, who had been assigned to the matter after Judge Kinder was appointed to the Appeals Court.

---

[8] In September, 2015, after she had pleaded guilty to tampering charges, Farak testified before the grand jury under a grant of immunity for any additional charges, concerning the timing and scope of her misconduct.

The report summarized the information learned from the grand jury investigations, and provided no recommendation on how to proceed; the report concluded that "[t]he results of the Commonwealth's investigation are now provided to the Court so that the Court can determine how to proceed in the matters before it" (footnote omitted).

10. Carey hearing. In 2015, ten defendants who had been convicted of drug offenses between May, 2006, and September, 2014, based on substances that had been tested at the Amherst lab filed renewed motions to dismiss, to withdraw guilty pleas, or for new trials. They asserted that they should be awarded postconviction relief based on Farak's tampering; the failure of the office of the Attorney General to disclose exculpatory evidence and to conduct an adequate investigation in 2013 on the nature and extent of Farak's misconduct; and inadequate conditions, policies, and procedures at the Amherst lab. The cases were consolidated and assigned to Judge Carey on December 7, 2015.

In December, 2016, Judge Carey conducted an evidentiary hearing over six days at which Kaczmarek, Foster, Verner, Mazzone, Ravitz, and Reardon testified. Edward Bedrosian (former first assistant attorney general), and Sheila Calkins (former deputy attorney general) also testified. In addition, Judge Carey heard testimony from Ballou, Irwin, and Thomas of

the State police; Flannery; Farak's attorney; former Amherst lab employees Hanchett, Salem, and Pontes; Timothy Woods, an employee of the State police crime laboratory in Sudbury, who conducted some retesting of substances that originally had been tested at the Amherst lab; and two laboratory quality experts, Robert Powers and Heather Harris. Although Farak did not testify, Judge Carey reviewed her grand jury testimony from the investigation by the office of the Attorney General. Judge Carey considered Farak's grand jury testimony to be "generally candid," but he did not credit her testimony regarding the reliability of her analysis or the extent of her addiction and her use of police-submitted samples, given the evidence that she had lied to her therapist in order to downplay her substance abuse. He did, however, credit other aspects of her testimony, including her statement that she had not succeeded in forging Hanchett's or Pontes's initials on evidence bags.

On June 26, 2017, Judge Carey released a memorandum of decision in which he found that (i) Farak's misconduct, beginning in 2004, "created a problem of systemic magnitude"; (ii) Foster and Kaczmarek exhibited "reprehensible" misconduct in continually withholding the mental health records and misleading Judge Kinder in a manner that constituted a fraud upon the court; and (iii) there was "no evidence that a comprehensive, adequate, or even reasonable investigation by any

office or agent of the Commonwealth had been attempted, concluded, or disclosed prior to issuance of the Caldwell Report." Judge Carey determined that evidence of deficiencies at the Amherst lab was not a sufficient basis for postconviction relief, but that the egregious misconduct by Farak, Foster, and Kaczmarek irreparably harmed some defendants.

Judge Carey did not call into question, however, any of the analysis performed by the other Amherst lab employees; he concluded that any postanalysis tampering by Farak did not have a negative impact on the defendants and thus did not justify postconviction relief. He determined also that the misconduct by the office of the Attorney General was limited to Foster and Kaczmarek, whose "intentional and deceptive actions ensured that justice would certainly be delayed, if not outright denied, . . . violat[ing] their oaths as assistant attorneys general and officers of the court."

The judge therefore concluded that, "at least with respect to selected drug lab defendants, the deliberate misconduct [of Kaczmarek and Foster] was so egregious that presumptive prejudice arises, so that dismissal with prejudice is the appropriate prophylactic remedy to deter similar future misconduct." He limited the class of defendants entitled to dismissal with prejudice to cases where (i) Farak had signed the drug certificate; (ii) the defendants' had sought postconviction

relief or discovery between January 19, 2013, and November 1, 2014, and their efforts had been unsuccessful; and (iii) the defendants' motions had been denied because of the misleading evidentiary record presented to Judge Kinder. Judge Carey indicated that the cases where defendants had filed motions to withdraw guilty pleas would require a more individualized factual inquiry to determine whether the defendant would have acted differently if he or she had known of Farak's misconduct at the time of the plea.[9]

11. Subsequent proceedings. In September, 2017, the petitioners filed a petition pursuant to G. L. c. 211, § 3, and G. L. c. 231A, § 1, in the county court, seeking relief based on Judge Carey's decision. Specifically, the petitioners requested dismissal with prejudice of all convictions "tainted by the Commonwealth's misconduct." They also asked the single justice to order the Commonwealth "to comply with its legal and ethical obligations to respond to this lab scandal and any future systemic crises."

Following a hearing on October 31, 2017, the single justice issued an order on November 2, 2017, requiring the parties to identify any cases in which there was agreement to vacate the convictions and to dismiss the matters with prejudice. The

_____

[9] The respondents do not contest Judge Carey's factual findings.

district attorneys agreed to vacate more than 8,000 convictions of individuals whom they classified as "Farak defendants," and to dismiss those charges with prejudice. According to the district attorneys, the definition of "Farak defendants" included any "defendants who pleaded guilty to a drug charge, admitted to sufficient facts to warrant a finding of guilty on a drug charge, or were found guilty of a drug charge in any case in which Farak signed a drug certificate as an analyst between August, 2004[,] and January, 2013, while she was employed at the [Amherst lab], except for the so-called 'Ruffin defendants.'"[10] At that point, there were approximately forty-five cases from Berkshire and Bristol Counties that the district attorneys had not agreed to dismiss; those cases subsequently have been dismissed.

On January 26, 2018, the single justice reserved and reported the case to the full court, and ordered the parties to address three questions:

> "1. Whether the defendants in some or all of the 'third letter' cases are entitled to have their convictions vacated, and the drug charges against them dismissed with prejudice, given the undisputed misconduct of the assistant Attorneys General found by Judge Carey in Commonwealth vs. Erick Cotto, Hampden Sup. Ct., No. 2007-770 (June 26, 2017) (memorandum and order on postconviction motions), and given the conduct of the District Attorneys that the petitioners allege was improper.

---

[10] "Ruffin defendants" are individuals who pleaded guilty before receiving results of the drug analysis in their cases. See Commonwealth v. Ruffin, 475 Mass. 1003, 1004 (2016).

"2. Whether the definition of 'Farak defendants' being employed by the District Attorneys in this case is too narrow; specifically, based on the material in the record of this case, whether the appropriate definition of the class should be expanded to include all defendants who pleaded guilty to a drug charge, admitted to sufficient facts on a drug charge, or were found guilty of a drug charge, if the alleged drugs were tested at the Amherst Laboratory during Farak's employment there, regardless [of] whether Farak was the analyst or signed the certificates in their cases.

"3. Whether, as the petitioners request, the record in this case supports the court's adoption of additional prophylactic measures to address future cases involving widespread prosecutorial misconduct, and whether the court would adopt any such measures in this case."

On April 5, 2018, the single justice vacated and dismissed with prejudice all convictions that were identified by the district attorneys and the Attorney General on or before March 30, 2018.

Discussion. We address each of the reported questions in turn.

1. "Third letter" cases. The first reported question asks whether the defendants in "third letter" cases are entitled to have their convictions vacated and dismissed with prejudice due to prosecutorial misconduct. Under the protocol established in Bridgeman II in response to Dookhan's misconduct, "third letter" cases are "cases that the District Attorneys intend to re-prosecute if motions for new trial are allowed, and that they represent can be prosecuted independently of any drug

certificate signed by Farak, or related testimony."  See Bridgeman II, 476 Mass. at 328.

As stated, when the single justice reserved and reported this case to the full court, there were approximately forty-five "third letter" cases from Berkshire and Bristol Counties in which Farak had signed the drug certificates and the district attorneys had not agreed to dismiss the convictions with prejudice.  Because those cases have now been dismissed, the first reported question is moot.  See Lawyers' Committee for Civil Rights & Economic Justice v. Court Administrator of the Trial Court, 478 Mass. 1010, 1011 (2017) (upholding single justice's dismissal of petition as moot where "no further effective relief [could] be granted").

2.  Definition of "Farak defendants."  The second reported question asks whether the class of "Farak defendants" includes "all defendants who pleaded guilty to a drug charge, admitted to sufficient facts on a drug charge, or were found guilty of a drug charge, if the alleged drugs were tested at the Amherst Laboratory during Farak's employment there, regardless [of] whether Farak was the analyst or signed the certificates in their cases."

a.  Bridgeman framework.  We confronted a similar challenge after the discovery of Dookhan's misconduct at the Hinton lab. The Dookhan petitioners twice asked this court to utilize its

superintendence authority to vacate and dismiss all Dookhan cases as a "global remedy."  See Bridgeman II, 476 Mass. at 321–322; Bridgeman v. District Attorney for the Suffolk Dist., 471 Mass. 465, 487 (2015) (Bridgeman I).  The petitioners in those cases argued that "the time and expense of proceeding on a case-by-case basis [was] untenable," Bridgeman I, supra, and that "a case-by-case adjudication of so many cases [was] 'doomed to fail' given the limited resources of the Commonwealth's indigent criminal defense system," so that "the only just and practical alternative . . . [was] the global remedy," Bridgeman II, supra at 314, 322.  The district attorneys maintained that "individual case-by-case adjudication of motions for a new trial brought by Dookhan defendants [was] both practical and fair."  Id. at 315.

In considering how best to balance the rights of defendants affected by governmental misconduct and society's interest in administering justice, we focused on four fundamental principles of our criminal justice system.  See Bridgeman II, 476 Mass. at 315–318.  See also Bridgeman I, 471 Mass. at 487, quoting Scott, 467 Mass. at 352 (declining to implement "global remedy," but fashioning procedure intended to "account for the due process rights of defendants, the integrity of the criminal justice system, the efficient administration of justice in responding to such potentially broad-ranging misconduct, and the myriad public interests at stake").

"First, where there is egregious misconduct attributable to the government in the investigation or prosecution of a criminal case, the government bears the burden of taking reasonable steps to remedy that misconduct." Bridgeman II, 476 Mass. at 315. We similarly noted in Cotto, 471 Mass. at 112, that "[t]he Commonwealth's obligation to conduct an investigation is premised on a prosecutor's duty to learn of and disclose to a defendant any exculpatory evidence that is held by agents of the prosecution team, who include chemists working in State drug laboratories. . . . It is incumbent on the Commonwealth to perform this duty in a timely fashion. The burden of ascertaining whether Farak's misconduct at the Amherst drug lab has created a problem of systemic proportions is not one that should be shouldered by defendants in drug cases." (Quotations and citations omitted.)

Second, "relief from a conviction generally requires the defendant to file a motion for a new trial." See Bridgeman II, 476 Mass. at 316. Such a motion is usually required because, without it, "we cannot be sure that a defendant wishes to accept the risk that the Commonwealth will retry the defendant rather than issue a nolle prosequi." Id. at 323. The "uncertainty and disruption inherent in being a defendant in a criminal trial" should not be forced on anyone who does not desire to be retried. Id.

Third, "dismissal with prejudice 'is a remedy of last resort,'" but may be available in certain limited circumstances. Id. at 316, quoting Commonwealth v. Cronk, 396 Mass. 194, 198 (1985). "Two parallel legal principles" balance "the rights of defendants . . . against the necessity for preserving society's interest in the administration of justice." Cronk, supra at 198-199. Under the first principle, "[w]here the prosecutor fails to disclose evidence the defendant is entitled to receive and the defendant is prejudiced by the failure to disclose, a motion to dismiss should not be allowed absent a showing of irremediable harm to the defendant's opportunity to obtain a fair trial." Id. at 198. See Commonwealth v. Lam Hue To, 391 Mass. 301, 314 (1984) ("Such a drastic remedy would be appropriate where failure to comply with discovery procedures results in irremediable harm to a defendant that prevents the possibility of a fair trial"). Alternatively, "prosecutorial misconduct that is egregious, deliberate, and intentional, or that results in a violation of constitutional rights may give rise to presumptive prejudice . . . and the 'drastic remedy' of dismissal of charges may become an appropriate remedy." See Cronk, supra at 198-199. The latter theory should be narrowly applied, and confined to situations where the misconduct has "cast such doubt . . . as to poison the entire investigation," Commonwealth v. Hine, 393 Mass. 564, 571 (1984), and a "stronger

deterrent" is warranted to prevent repetition of such misconduct. See Bridgeman II, 476 Mass. at 322; Commonwealth v. Lewin, 405 Mass. 566, 587 (1989) ("The only reason to dismiss criminal charges because of nonprejudicial but egregious police misconduct would be to create a climate adverse to repetition of that misconduct that would not otherwise exist"); Commonwealth v. Manning, 373 Mass. 438, 444 (1977) ("The indictment itself is so inextricably interwoven with the misconduct which preceded it that the only appropriate remedy here is to dismiss the indictment").

Finally, "where large numbers of persons have been wronged, the wrong must be remedied in a manner that is not only fair as a matter of justice, but also timely and practical." Bridgeman II, 476 Mass. at 317. "A remedy that is perfect in theory is not perfect in fact if it would take too long to be accomplished, or if the resources required to implement it would overwhelm the limited resources available to the courts." Id. at 317-318.

We stated in Bridgeman II, 476 Mass. at 322-323, that "dismissal with prejudice for government misconduct is very strong medicine . . . [that] should be prescribed only when the government misconduct is so intentional and so egregious that a new trial is not an adequate remedy." Noting that Dookhan's misconduct was not accompanied by misconduct by a prosecutor or

an investigator, we ultimately determined that the stronger deterrent of dismissal with prejudice was not required. See id. at 322. Accordingly, we established the Bridgeman II protocol to allow efficient case-by-case adjudication of the remaining cases affected by Dookhan's misconduct. Id. at 326.

b. Appropriate remedy. The petitioners argue that the very strong medicine of dismissal with prejudice is required here. We agree. The government misconduct by Farak and the assistant attorneys general was "so intentional and so egregious" that harsher sanctions than the Bridgeman II protocol are warranted. See Bridgeman II, 476 Mass. at 322. Indeed, before the briefs were filed, the district attorneys had agreed to bypass the Bridgeman II protocol and to dismiss with prejudice all convictions based on drug certificates signed by Farak.

It is difficult, however, to determine the appropriate scope of the dismissal remedy. In Cronk, 396 Mass. at 199, we cautioned that "[r]emedies for prosecutorial misconduct should be tailored to the injury suffered and should not unnecessarily infringe on competing interests." See Commonwealth v. Carney, 458 Mass. 418, 427 (2010) (sanctions "should be limited to truly remedial, and not punitive measures" [citation omitted]). We therefore must determine whether the class of defendants whose cases are subject to dismissal with prejudice should include

individuals whose convictions rest upon samples tested at the Amherst lab by chemists other than Farak.

The petitioners contend that all convictions based on drug samples tested at the Amherst lab during Farak's tenure should be vacated and dismissed with prejudice, regardless of whether Farak signed the drug certificate. They argue that the precise scope of Farak's misconduct is "unknown (and at this point, unknowable)," because of the Commonwealth's failure to conduct a prompt and adequate investigation.[11] They contend also that dismissals with prejudice are "the only appropriate remedy" for the egregious prosecutorial misconduct here, and that such dismissals are "a necessary prophylactic in response to the Commonwealth's transforming the courts into unwitting agents of injustice."

The sweeping extent of this proposed remedy, however, is not supported by the record. The only evidence of misconduct by Farak between 2004 and 2009 is her theft of the methamphetamine

---

[11] The petitioners contend also that the Attorney General's office and the district attorneys deliberately impeded defendants' appellate rights by failing to inform defendants of the misconduct at the Amherst lab while the matter was being litigated. In our determination of the appropriate remedies, we have considered the full scope of the misconduct by the office of the Attorney General. We discern no fault, however, in any actions by the district attorneys and their offices. The district attorneys properly turned over the evidence they received to defendants whose convictions were called into question by Farak's misconduct, and engaged in time-consuming work promptly to identify and notify individuals whose cases were affected by Farak's misconduct.

oil standard. There is no evidence to support a finding that Farak's consumption of portions of the methamphetamine standard affected other chemists' analyses of other controlled substances. Accordingly, the complete dismissal with prejudice of all convictions based upon samples tested at the Amherst lab during Farak's employment is not a sufficiently tailored remedy.

The district attorneys would limit the class of "Farak defendants" to the individuals whose convictions rested upon samples tested by Farak herself, precisely those individuals whose cases already have been vacated and dismissed with prejudice. The district attorneys reach their recommendation on the basis of Judge Carey's findings that the integrity of the analyses by other chemists was "not in question," and that defendants who did not seek discovery or postconviction relief were not "material[ly] connect[ed]" to the Attorney General's office's egregious misconduct.

It is undisputed that Farak tampered with other chemists' samples, both before and after they had been tested. By 2011, Farak intentionally was manipulating information in the inventory list stored on the lab's computer to assign herself samples that involved drugs she wanted for her own use. In order to avoid detection of her theft of drugs before they had been analyzed, she altered the gross weight on the drug receipt before another chemist tested the sample, and then changed the

weight back to the original number before law enforcement officers retrieved the samples after testing. Farak admitted that, by the summer of 2012, she also was tampering with other chemists' samples after the samples had been tested, by cutting into sealed evidence bags to remove portions of the samples and then resealing the remainder in pre-initialed evidence bags that she had stolen from other chemists. In addition, she regularly replaced stolen drugs with counterfeit substances.

We must remedy these forms of evidence tampering and cannot limit relief only to those defendants where Farak signed the drug certificate. Any interference with samples that calls into question the accuracy of the drug certificates or prevents later retesting of the original substance diminishes the reliability and integrity of the forensic testing at the Amherst lab, and also reduces public confidence in other drug certificates from other laboratories. The district attorneys' proposal does not go far enough to protect the rights of defendants whose convictions rest upon samples that were tested at the Amherst lab during the period of Farak's misconduct.

The appropriate remedy therefore lies between dismissing all cases relying on samples tested at the Amherst lab, regardless of the chemist who performed the analysis, and dismissing no cases where samples were tested by chemists other than Farak. The Attorney General's office suggests that,

because Farak testified that she tampered with other chemists' samples in mid-June, 2012, any defendant whose conviction rests upon evidence tested at the Amherst lab by any chemist between June, 2012, and January, 2013, should be eligible to have the conviction vacated and dismissed pursuant to the Bridgeman II protocol.  Although the Attorney General's office believes that Farak tampered with only a small number of samples during that period, Farak herself was unable to identify which samples she had misused; the reliability of all samples tested during that time period therefore is compromised.

Before the grand jury, Farak testified that her theft of other chemists' samples was limited to a few cases.  In response to a question from the assistant district attorney, "At any point . . . . did you ever manipulate or take samples from other chemists at the laboratory?" she responded, "Yes."  She then detailed a few specific instances of having removed amounts from other chemists' samples, and said that she would do so generally if she was able to obtain an open, signed plastic bag with other chemists' initials that the chemists used to reseal the samples after they had completed their testing.  She explained that she would try not to use others' samples unless she had no "other way" to obtain crack cocaine.

> "If it was either me taking from my own evidence I analyzed or other people's, I would definitely do my own.  That was one of the lines I had thought I would never cross.  I

wouldn't tamper with evidence, that I wouldn't smoke crack and then wouldn't touch other people's work due to how it could look."

This testimony was consistent with Farak's proffer. "Farak took from approximately six of Hanchett's samples; including a 24.5 gram crack cocaine sample from Pittsfield and a 3.5 gram crack cocaine sample from Northampton. Farak used Hanchett's initialed evidence bags to repackage the samples. Farak took from one of Pontes' samples; specifically 30 grams of 73 grams of powder cocaine from a Springfield case. Farak replaced the cocaine with a counterfeit substance (baking soda) and made crack cocaine with it."

There are two problems, however, with the assumption that Farak did not steal from her colleagues prior to the summer of 2012. First, Judge Carey did not credit those portions of her testimony that were at odds with what she had reported to her therapists about her addiction and her theft of police-submitted samples. In 2009, Farak told her therapist that she had obtained drugs from the lab by taking portions of samples that had been sent to the lab to be tested. Farak later testified that she was totally controlled by her drug addiction, and that, in tampering with police-submitted samples, she had begun crossing lines that she never thought she would cross.

Second, Farak's testimony was not supported by postconviction discovery produced by the Attorney General's

office as part of its investigation. The Attorney General was unable to corroborate Farak's testimony before the grand jury, and as part of her proffer, as to specific samples where she said that she had taken portions of a sample that had been assigned to another chemist.

Farak testified that she had skimmed from the samples in three particular cases where she remembered the specific amounts involved. She testified in detail as to the amounts that she had removed from those samples. One was a case in which the Springfield police department submitted a sample of seventy-three grams of powder cocaine. The sample was assigned to Pontes. The second was a case submitted by the Northampton police department involving 3.5 grams of crack cocaine that had been assigned to Hanchett, and the third was a sample of 24.5 grams of crack cocaine submitted by the Pittsfield police department that had been assigned to Hanchett. The database provided to the office of the Attorney General of all samples tested at the Amherst Lab did not directly match any of these cases, and the office of the Attorney General was unable to confirm the existence of any such samples. Thus, the record indicates that Farak's testimony as to the extent of her misconduct was, at least at times, unreliable.

It is our responsibility, in the exercise of this court's supervisory authority, to craft a remedy suitable to the

available, reliable evidence.  As far as can be determined on this record, Farak's drug use spiraled out of control at the beginning of 2009, when she nearly depleted the jar of methamphetamine oil and started to search for other sources of drugs to satisfy her addiction.  Around that time, Farak began manipulating the computer system.  She also started stealing from police-submitted samples before and after they were tested, and from samples that had been assigned to other chemists.

In light of the extensive and indeterminable nature of Farak's misuse of police samples and the lab's standards, a much more inclusive remedy is required than that suggested by either the district attorneys or the Attorney General.  In order to protect the integrity of the criminal justice system, and to afford relief to defendants whose convictions may have rested upon tampered evidence, we conclude that, in addition to those already dismissed where Farak signed the drug certificate, all convictions based on evidence that was tested at the Amherst lab on or after January 1, 2009, regardless of the chemist who signed the drug certificate, and all methamphetamine convictions where the drugs were tested during Farak's tenure at the Amherst lab, must be vacated and dismissed.  Accordingly, the class of "Farak defendants" includes the defendants in all of these cases.

3. Prophylactic measures. Finally, we turn to the third reported question: whether the court should adopt additional prophylactic measures to address any future cases involving prosecutorial misconduct.

The petitioners argue that the court should issue three standing orders to "create a better mechanism for addressing government misconduct [than future lawsuits] and ensur[e] disclosure of exculpatory evidence." The petitioners request the court to issue a standing Brady order[12] requiring specific disclosures, and setting forth specific disclosure deadlines. The Attorney General indorses this request; the district attorneys argue that Mass. R. Crim. P. 14, as appearing in 442 Mass. 1518 (2004), and the rules of professional conduct adequately address prosecutors' disclosure obligations. The petitioners suggest that standing Bridgeman II and Cotto orders, which would provide a procedure by which district attorneys could report and remedy government misconduct, would be appropriate so that any future misconduct of this nature could be remedied without protracted litigation.[13] The district

---

[12] See Brady v. Maryland, 373 U.S. 83, 87 (1963).

[13] The petitioners request that the court fine the Attorney General's office to punish its past misconduct adequately, and to create an incentive for the Attorney General's office to put into place meaningful controls to monitor, detect, and disclose future misconduct. The Attorney General does not dispute that the court has the authority, pursuant to Mass. R. Crim. P.

attorneys argue that the Bridgeman II and Cotto protocols would be "one size fits all" attempts to resolve unknown future misconduct, and that it would be preferable to tailor responses to any particular case, should one arise.

a. Brady order. A prosecutor's core duty is "to administer justice fairly." Commonwealth v. Tucceri, 412 Mass. 401, 408 (1992). To fulfil that duty, a prosecutor is required to turn over exculpatory evidence to a defendant without regard to its impact on the case. See generally Brady v. Maryland, 373 U.S. 83, 87 (1963) (explaining that failure to disclose "evidence favorable to an accused . . . [that] is material either to guilt or to punishment" is violation of due process). Litigation strategy plays no role in this process.

---

14 (c) (1), to impose remedial monetary sanctions for a discovery violation. See Commonwealth v. Frith, 458 Mass. 434, 439 (2010) (sanctions may be imposed under Mass. R. Crim. P. 14 [c] [1] for failure to comply with discovery obligations); Commonwealth v. Carney, 458 Mass. 418, 427 (2010) (rule 14 [c] [1] sanctions should be "tailored appropriately to cure any prejudice resulting from a party's noncompliance" with its discovery obligations).

The Attorney General argues, however, that monetary sanctions are unnecessary because the office of the Attorney General has taken steps to avoid future misconduct, including revising existing policies and procedures. We do not agree. Based on our experience in Bridgeman II, we are aware of the substantial costs associated with providing adequate notice to thousands of individuals whose cases will be dismissed, including hiring outside vendors to research last known addresses. Because the office of the Attorney General is responsible for the prosecutorial misconduct, it shall bear the entire financial burden associated with notifying those affected defendants that their cases have been dismissed.

Under our rules of professional conduct, a prosecutor is required to "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigate the offense."  Mass. R. Prof. C. 3.8 (d), as appearing in 473 Mass. 1301 (2016).  See Mass. R. Prof. C. 3.4 (a), as appearing in 471 Mass. 1425 (2015) (attorney prohibited from unlawfully obstructing another party's access to evidence or from concealing evidence); Mass. R. Prof. C. 3.8 (g), as appearing in 473 Mass. 1301 (2016) (prosecutor may not avoid pursuit of exculpatory evidence); Mass. R. Prof. C. 3.8 (i), as appearing in 473 Mass. 1301 (2016) (postconviction disclosure of exculpatory evidence).

The due process clauses of the Federal Constitution and the Massachusetts Declaration of Rights require that the Commonwealth disclose to a defendant material, exculpatory evidence in its possession or control.  See United States v. Agurs, 427 U.S. 97, 106-107 (1976); art. 12 of the Declaration of Rights of the Massachusetts Constitution ("every subject shall have a right to produce all proofs, that may be favorable to him"); Commonwealth v. Bing Sial Liang, 434 Mass. 131, 135 (2001).  "A prosecution that withholds evidence . . . which, if made available, would tend to exculpate [a defendant] or reduce the penalty helps shape a trial that bears heavily on the defendant.  That casts the prosecutor in the role of an

architect of a proceeding that does not comport with standards of justice . . . ." Brady, 373 U.S. at 87.

Under our rules of criminal procedure, one of the nine categories of "automatic discovery" that the Commonwealth must provide to the defendant at or before the pretrial conference is "[a]ny facts of an exculpatory nature."[14]  See Mass. R. Crim. P. 14 (a) (1) (A) (iii), as amended, 444 Mass. 1501 (2005); E.B. Cypher, Criminal Practice and Procedure § 26:8 (4th ed. 2014).[15] Rule 14 also requires a prosecutor to disclose certain specific categories of potentially exculpatory evidence, including all statements made by the defendant, "all promises, rewards or inducements made to witnesses the party intends to present at trial," and "all statements made in the presence of or by an identifying witness that are relevant to the issue of identity or to the fairness or accuracy of the identification

---

[14] At the pretrial conference, the prosecutor and defendant are to "consider such matters as will promote a fair . . . disposition of the case," including discovery.  See Mass. R. Crim. P. 11 (a), as appearing in 442 Mass. 1509 (2004).  We emphasize that judges may choose to be active participants, where necessary, to ensure compliance with disclosure obligations.

[15] Rule 14 (a) of the Massachusetts Rules of Criminal Procedure incorporates the constitutional disclosure requirements of Brady.  See Cassidy, Plea Bargaining, Discovery, and the Intractable Problem of Impeachment Disclosures, 64 Vand. L. Rev. 1429, 1481 (2011).  See also Reporter's Notes to Mass. R. Crim. P. 14 (a), Massachusetts Rules of Court, Rules of Criminal Procedure (Thomson Reuters 2018).

procedures." See Mass. R. Crim. P. 14 (a) (1) (A) (i), (viii), (ix).

We take this opportunity to reexamine our rules of criminal procedure to determine whether they should be modified to better facilitate the timely disclosure of exculpatory evidence, and refer the question of an amendment of rule 14 to the court's standing advisory committee on the rules of criminal procedure.

Rule 14 broadly defines exculpatory evidence as "[a]ny facts of an exculpatory nature" (emphasis added). Mass. R. Crim. P. 14 (a) (1) (A) (iii). See Commonwealth v. Hill, 432 Mass. 704, 715-716 (2000) (impeachment evidence is exculpatory); Commonwealth v. Ellison, 376 Mass. 1, 22 n.9 (1978) ("'exculpatory' is not a technical term meaning alibi or other complete proof of innocence, but simply imports evidence which tends to negate the guilt of the accused . . . or, stated affirmatively, supporting the innocence of the defendant" [quotations omitted]). While rule 14 envisions a broad disclosure requirement for exculpatory facts, the rule explicitly identifies only a few specific categories of potentially exculpatory information that a prosecutor must disclose. See Mass. R. Crim. P. 14 (a) (1) (A) (i), (viii), (ix) (Commonwealth must disclose defendant's statements, "promises, rewards or inducements" given to prosecution

witnesses, and statements made during and about identification procedures).

To provide more detailed guidance to prosecutors, we ask the standing advisory committee to draft a proposed Brady checklist to clarify the definition of exculpatory evidence. A practice indorsed by the American Bar Association,[16] a Brady checklist establishes a more thorough baseline of the most likely sources and types of exculpatory information for prosecutors to consider. Brady checklists have been added to the local rules in many Federal District Courts, in some instances in response to prosecutorial misconduct. See generally Sullivan, Enforcing Compliance with Constitutionally-Required Disclosures: A Proposed Rule, 2016 Cardozo L. Rev. de novo 138 (2016) (describing author's experience as trial judge in case where sitting United States Senator was convicted but Federal prosecutors concealed evidence favorable to defendant, and discussing local rules that incorporate requirements of Brady). See also Rule 26.2 of the Local Rules of the United States District Court for the Northern District of Florida (eff. Nov. 24, 2015); Rule 88.10 of the Local Rules of the United States District Court for the Southern District of Florida (rev. Dec. 1, 2017); Yaroshefsky, Prosecutorial Disclosure

---

[16] See American Bar Association, Resolution (rev. 2011), http://www.abajournal.com/files/104A_Revised_2011.pdf [https://perma.cc/5T2D-2DCR].

Obligations, 62 Hastings L.J. 1321, 1327-1328, 1346 (2011) (describing American Bar Association Criminal Justice Standards governing "Disclosure of Evidence by the Prosecutor," as well as indorsing use of Brady checklists).

No checklist can exhaust all potential sources of exculpatory evidence.  It is crucial, therefore, that the proposed amendment to rule 14 make clear that the potential universe of exculpatory evidence includes, but is not limited to, the types of evidence included in the checklist.  See generally Jones, Here Comes the Judge:  A Model for Judicial Oversight and Regulation of the Brady Disclosure Duty, 46 Hofstra L. Rev. 87, 113–114 (2018).  See also Sullivan, supra at 148-149; Rule 116.2 of the Local Rules of the United States District Court for the District of Massachusetts (eff. June 1, 2018).  The committee should consider whether the categories used in the Federal District Courts would be useful, and also should consider whether any other categories would help facilitate the disclosure of Brady materials.

We emphasize, in addition, that where a prosecutor is unsure whether exculpatory information should be disclosed, due to a concern regarding privilege or work product, or for any other reason, the prosecutor must file a motion for a protective order and must present the information for a judge to review in camera.  See Mass. R. Crim. P. 14 (a) (6).  The judge will then

decide whether, and under what conditions, the information must be disclosed.  Id.  Absent a protective order, no prosecutor, whether in the office of the Attorney General or in the office of a district attorney, has the authority to decline to disclose exculpatory information.

b.  Bridgeman II and Cotto orders.  The petitioners argue that the court should adopt standing orders based on the procedures formulated in Bridgeman II and Cotto.  A Bridgeman II order would require that a prosecutor who knew, or had reason to know, that misconduct had occurred in a particular case would have ninety days to notify the Chief Justice of the Trial Court and the Committee for Public Counsel Services and to provide them with a list of cases affected by the misconduct.  See Bridgeman II, 476 Mass. at 328.  The district attorneys then would have the burden of establishing, for any case that they did not agree to dismiss, that they had untainted evidence to support the conviction.  Id.  A Cotto order would require a government attorney who knows that attorney misconduct affected a criminal case to notify the Chief Justice of the Trial Court, the Committee for Public Counsel Services, and the Office of Bar Counsel within thirty days.  See Cotto, 471 Mass. at 114.  The petitioners argue that, when misconduct occurs, a lawsuit should not be required in order to initiate these protocols.  The Attorney General agrees with the petitioners that the requested

standing orders should issue. The district attorneys contend, however, that such standing orders do not take into consideration that the Bridgeman II protocol placed the burden on the district attorneys, in part out of necessity, because of the need to adjudicate 20,000 convictions. The district attorneys note also that such standing orders would be repetitive of existing professional and ethical obligations for attorneys in the Commonwealth.

In fashioning the remedy in Bridgeman II, we took into account the scope of the misconduct and the number of convictions implicated by the misconduct. See Bridgeman II, 476 Mass. at 317 ("where large numbers of persons have been wronged, the wrong must be remedied in a manner that is not only fair as a matter of justice, but also timely and practical"). While we do not "expect defendants to bear the burden of a systemic lapse," id., the balance of equities will not always favor a departure from the general principle that "relief from a conviction generally requires the defendant to file a motion for a new trial" (citation omitted). See id. at 316. If similar, widespread abuse does come to light in the future, the appropriate remedy must be complete, and it must correspond to the scope of the misconduct. A court reviewing that misconduct in the first instance is best positioned to determine the remedy

appropriate to a particular case.  We therefore decline to adopt standing <u>Bridgeman II</u> and <u>Cotto</u> orders.

<u>Conclusion</u>.  We answer the reported questions as follows:

1.  The question is moot, as there are no remaining "third letter" defendants.

2.  The class of "Farak defendants" includes all defendants who pleaded guilty to a drug charge, admitted to sufficient facts on a drug charge, or were found guilty of a drug charge, where (i) Farak signed the certificate of analysis; (ii) the conviction was based on methamphetamine and the drugs were tested during Farak's tenure at the Amherst lab; or (iii) the drugs were tested at the Amherst lab on or after January 1, 2009, and through January 18, 2013, regardless of who signed the certificate of analysis.

3.  Prophylactic measures are appropriate based on the record in this case.  We recommend that this court's standing advisory committee on the rules of criminal procedure propose amendments to Rule 14 of the Massachusetts Rules of Criminal Procedure to include a <u>Brady</u> checklist and any other modifications the committee believes would be beneficial, consistent with this opinion.

The matter is remanded to the county court for entry of a declaratory judgment, as set forth in this opinion, vacating and dismissing the drug convictions of all "Farak defendants," as defined herein, and for further proceedings consistent with this opinion.

<u>So ordered</u>.